Iver J. FREEMAN, Plaintiff, Appellee,

v.

PACKAGE MACHINERY COMPANY,
Defendant, Appellant.

No. 88–1130.

United States Court of Appeals,
First Circuit.

Heard June 7, 1988.

Decided Nov. 22, 1988.

Anthony J. Crement, with whom Jeffrey S. Heller, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, Ill., Maurice M. Cahillane and Egan, Flanagan & Egan, Springfield, Mass., were on brief, for defendant, appellant.

John C. Sikorski, with whom John H. Madden, Jr., and Robinson Donovan Madden & Barry, P.C., Springfield, Mass., were on brief, for plaintiff, appellee.

Before BOWNES, TORRUELLA and SELYA, Circuit Judges.

SELYA, Circuit Judge.

An Oriental philosopher once wrote that the business of a faithful retainer comprises "discharging loyal service to his master ... and, with due consideration of his own position, ... devoting himself to duty above all." Yamaga Soko, *The Way of the Samurai* (1680). According to plaintiff-appellee Iver J. Freeman, he had been an allegiant myrmidon after this fashion, yet defendant-appellant Package Machinery Company (PMC) had repaid his steadfastness with the cruelest ingratitude: banishment. Freeman sued, claiming that his employer had fired him on the basis of age contrary to both federal and state law. The case was removed to federal district court.

After a longish trial, a jury found that PMC had violated the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* (ADEA), and awarded damages. Plaintiff's companion state-law claim was tried to the court. The judge made an incremental award for emotional distress (an element of damages recoverable under the Massachusetts statute, but not under the ADEA) and eventually granted a motion for prejudgment interest. After some bickering as to the total amount of damages properly recoverable, the district court ordered a substantial remittitur. Plaintiff acceded. The court thereupon entered an amended judgment in Freeman's favor for $653,718.94 (comprising aggregate damages of $405,449 and prejudgment interest of $248,269.94). Defendant appealed.

A potpourri of issues simmer in the pot. Some are so unnourishing that we see no need to discuss them at all. We deal instead with what we perceive to be PMC's three chief contentions: (1) that the evidence preponderated against the liability finding, (2) that prejudgment interest was wrongly imposed, and (3) that the fees of certain expert witnesses were overgenerously assessed. Rather than positing the facts in the abstract, we review them in connection with the weight-of-the-evidence challenge.

## I. LIABILITY

Appellant's claim that the sheer weight of the evidence overpowered the jury's liability determination can best be examined in the context of its argument that its motion for a new trial, brought after verdict under Fed.R.Civ.P. 59(a), should have been granted unconditionally, that is, that the verdict for Freeman should have been set aside entirely instead of merely being trimmed as to amount.

### A. *Standard of Review.*

We have recently rehearsed the principles which inform appellate oversight of new trial motions in civil cases:

> In the federal system, a trial judge cannot displace a jury's verdict merely because he disagrees with it or would have found otherwise in a bench trial. Absent error of law ..., the judge's prerogative to set aside a verdict crystallizes only if "it is quite clear that the jury has reached a seriously erroneous result." *Borras v. Sea–Land Service, Inc.,* 586 F.2d 881, 887 (1st Cir.1978) (citation omitted). In our litany of cases, we have come to refer to this criterion as the "manifest miscarriage of justice" standard. *E.g., Wagenmann v. Adams,* 829 F.2d 196, 200–01 (1st Cir.1987); *Insurance Co. of North America v. Musa,* 785 F.2d 370, 375 (1st Cir.1986); *Valm v. Hercules Fish Products, Inc.,* 701 F.2d 235, 237 (1st Cir.1983); *Hubbard v. Faros Fisheries, Inc.,* 626 F.2d 196, 200 (1st Cir.1980).

*Milone v. Moceri Family, Inc.,* 847 F.2d 35, 37 (1st Cir.1988). Put another way, the district court may order a new trial only if it is convinced that the jury's verdict is "against the clear weight of the evidence, or is based upon evidence which is false, or will result in a clear miscarriage of justice...." *Coffran v. Hitchcock Clinic, Inc.,* 683 F.2d 5, 6 (1st Cir.), *cert. denied,* 459 U.S. 1087, 103 S.Ct. 571, 74 L.Ed.2d 933 (1982). The mere fact that a contrary verdict may have been equally—or even more easily—supportable furnishes no cogniza-

ble ground for granting a new trial. If the weight of the evidence is not grotesquely lopsided, it is irrelevant that the judge, were he sitting jury-waived, would likely have found the other way. And if the judge rejects a new trial motion, we review his application of this hard-to-achieve standard solely for abuse of discretion. *See Milone,* 847 F.2d at 37; *Real v. Hogan,* 828 F.2d 58, 61 (1st Cir.1987).

On this appeal, then, PMC's task is complicated exponentially; its assault on the finding must penetrate a pair of bucklers. In the first instance, deference is due to "the jury's constitutionally sanctioned role as finder of fact," *Mayo v. Schooner Capital Corp.,* 825 F.2d 566, 570 (1st Cir.1987); and then, deference is due to the trial judge's "superior ability to monitor the conduct of the trial and assess the credibility of the witnesses...." *Id.* Mindful of this double shielding and the formidable challenge of persuasion which it yields, we evaluate the evidence to determine whether justice has miscarried.

## B. *Factual Predicate.*

Some of the central facts in this case are essentially undisputed. Freeman went to work for Reed–Prentice (RP) in 1946. When PMC acquired the firm some eight years later, he stayed on.[1] Except for a five year hiatus (1958–63), plaintiff remained in appellant's employ until more than a quarter century had passed. During his tenure, he received sequential promotions which led, in 1972, to a vice-presidency. At the same time, he became general manager of the RP division. When discharged in the fall of 1980, Freeman was sixty years old. His successor, Lawrence Bauer, was forty-eight.

As we proceed deeper into the case, the remaining facts and the inferences to be drawn from them become more sententious. Plaintiff contended that he was performing his duties well, and that his ouster was a result of age discrimination. He adduced plethoric evidence of satisfactory work performance, including his string of

promotions and bonuses, an average work week of over fifty hours, a litany of contributions to increased productivity, and an impressive collection of encomia within the industry. Freeman attempted to buttress this evidence by suggesting that his was not an isolated case; he argued that, for many years, PMC had practiced age discrimination under the stewardship of its president, Roger Putnam, Jr. To support this theory, he offered the testimony of a degree-draped statistician, Dr. George Cobb. After examining certain data, Cobb testified that the material revealed a "pattern ... totally consistent with a practice of age discrimination." According to the records on which the witness relied, in the roughly two decades between 1965 and the time of trial, eighteen persons at vice-presidential (or higher) echelons had ceased to be employed by PMC. On average, these executives vanished at 52.7 years of age; only three reached age sixty-two while so employed. Two-thirds of the group were replaced by substantially younger people (forty-five years of age, on average). Cobb found these statistics telling, testifying that he had "never encountered a pattern [of discrimination] as striking as this."

PMC hotly contested these charges. It asserted that appellee's age was irrelevant: the real reason for firing Freeman was the collapse of his working relationship with his immediate superior, Burke Weisend. According to appellant, Weisand—not Putnam—was the key decisionmaker in this case. PMC adduced substantial evidence indicating that appellee had become stubbornly unwilling to comply with Weisend's directions, especially in two areas. One aspect of the supposed conflict was Freeman's failure to develop a "five-year plan" for the RP division. From 1978 forward, appellant avouched, Freeman was often urged to prepare such a plan but never did so. Appellee sought to parry this thrust by showing that Weisand, at divers times, attached relatively low priority to the project.

---

1. From and after that time, appellant manufactured packaging equipment through its packaging division and injection molding machinery under the aegis of its RP division.

The other battleground concerned SPI, a trade organization which derived its membership from within various segments of the plastics industry. PMC was a member. Freeman, with his company's full knowledge, had been extensively involved in SPI activities for some time. In 1976, he became the organization's vice-chairman; two years later, he succeeded to the chair. Appellant contended that these activities caused strife in the executive suite, that plaintiff devoted too much time to SPI, and that SPI involvement interfered with plaintiff's effective performance of his corporate duties. Disagreeing, Freeman presented evidence that (1) he kept his SPI activities within appropriate parameters, (2) Putnam encouraged him to accept the SPI vice-chairmanship, and (3) many other senior PMC employees, including Weisend and Putnam, spent comparable amounts of time laboring in the variegated vineyards of similar trade associations. In a nutshell, appellee saw his SPI linkage as a net plus for PMC.

### C. *Applicable Law.*

■ With this thumbnail sketch of the evidence in place, we advert briefly to the substantive legal principles which control the case. Under the ADEA, Freeman bore the burden of proving that his years were the determinative factor in his discharge, that is, that he would not have been fired but for his age. *See Menard v. First Security Services Corp.*, 848 F.2d 281, 285 (1st Cir.1988); *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1019 (1st Cir.1979). Without serious question, plaintiff made out his prima facie case: he was over the age of forty (and thus within the "protected" group); he was cashiered and replaced;[2] and he adduced credible evidence that his work

was adequate to meet PMC's legitimate expectations. This, we think, was enough. *See, e.g., Menzel v. Western Auto Supply Co.*, 848 F.2d 327, 328 (1st Cir.1988); *Loeb*, 600 F.2d at 1017–18. We think so notwithstanding defendant's adamantine insistence that plaintiff's job performance was not up to snuff. Freeman tendered some evidence which, if believed, proved that he was doing his chores proficiently. That burden of production having been met, the job-performance integer of the prima facie case was put in place.

■ Once plaintiff presented his prima facie case, an inference of age discrimination arose. *See Loeb*, 600 F.2d at 1011 n. 5. This put the ball in defendant's court. But the burden of proof did not shift; PMC bore only a burden of producing evidence of some valid, nondiscriminatory rationale for the firing. *Menzel*, 848 F.2d at 328; *Dea v. Look*, 810 F.2d 12, 15–16 (1st Cir. 1987); *Loeb*, 600 F.2d at 1011. In a Title VII case, we have described the burden thusly:

> Defendants need not persuade the court that they were actually motivated by the proffered reason. It is sufficient if their evidence raises a genuine issue of fact as to whether they purposefully discriminated against the plaintiff. In other words, the explanation provided must be legally sufficient to justify a judgment in their favor.

*Keyes v. Secretary of the Navy*, 853 F.2d 1016, 1023 (1st Cir.1988). This burden of production was unarguably met by introduction of the evidence suggesting friction between Freeman and his immediate superior and giving texture to those charges by reference to the five-year plan and the SPI brouhaha. In this way, defendant set out

---

**2.** In this case, Freeman's job was filled by a more youthful man. Nevertheless, though the point is not directly in issue here, we deem it appropriate to point out that our precedents are unclear as to whether a plaintiff in an ADEA case must prove as part of his prima facie case that he was replaced by a younger person or person outside the protected age group. *Compare, e.g., Loeb*, 600 F.2d at 1012–13 (disclaiming any such requirement) *with, e.g., Dea v. Look*, 810 F.2d 12, 14 n. 1 (1st Cir.1987) (contra). On close analysis, it is plain that the *Dea*

dictum rests on a misreading of *Loeb*. And cases such as *Menard*, 848 F.2d at 285, simply perpetuate this slip of the pen. Although as a practical matter it may be unlikely that a plaintiff who was not supplanted by a younger individual will succeed in an ADEA suit, *Loeb* remains the law of this circuit. Accordingly, we expressly disclaim the *Dea* dictum and hold that replacement by a younger person (or one outside the "protected" age group) is not an element of the plaintiff's prima facie case in an ADEA suit.

an explanation which—if thought truthful—was sufficient to elucidate the adverse employment action.

This articulation of plausible, nondiscriminatory reasons for letting Freeman go was enough "to erase the presumption raised by plaintiff's prima facie case." *Id.* At that point, it was up to Freeman, unassisted by the original presumption, to show that PMC's laundry list of reasons was but a pretext for age discrimination. *Menzel,* 848 F.2d at 328. That burden required persuasion in two respects: first, "to show that the defendants' proffered reasons for [firing plaintiff and] hiring someone else were apocryphal," *Keyes,* 853 F.2d at 1026; and second, to demonstrate "that those reasons were pretexts *aimed at masking [age] discrimination.*" *Id.* (emphasis in original). *See also Menard,* 848 F.2d at 287 (critical "issue is whether [employer] fired [plaintiff] *because of his age*") (emphasis supplied); *Loeb,* 600 F.2d at 1019 (similar). Issue having been joined, we must scrutinize the evidence to see if there are telltale signs that the jury, which found that plaintiff had satisfied both prongs of this standard, was so gravely mistaken that we should interfere.

### D. *The Expert Witness's Testimony.*

Before undertaking this two-part inquiry and proceeding in light of it, we must first wrestle with a vexing tangram. The testimony of the statistical expert, Dr. Cobb, served as a bearing wall in the structure of Freeman's case. This testimony, PMC exhorts, was improperly admitted. Logic demands that we resolve this evidentiary enigma before venturing to assess the weight and sufficiency of plaintiff's proof.

Appellant promulgates a host of objections to the disputed evidence. It argues variously (1) that Cobb's testimony was virtually devoid of probative value because the professor relied on too tiny a sample universe (departed vice-presidents and presidents since 1965) and failed to differentiate between employees who left the company voluntarily and those who were cashiered; (2) that the ill effects of the testimony were compounded by a related ruling of the district court excluding evidence of the reasons why employees other than Freeman separated from service; (3) that the meagre probative value of the statistical evidence was greatly outweighed by its unfair prejudicial impact; and (4) that in any event, plaintiff wrongly engaged in obfuscatory discovery conduct, thereby depriving appellant of an opportunity adequately to respond to the challenged testimony.

■ 1. *Failure to Object.* Our consideration of these questions is colored by an initial diagnosis: appellant's challenge suffers from a serious strain of procedural paralysis, since PMC did not object to the testimony at trial. We have long hewed to the idea that failure to make contemporaneous objection, absent exceptional circumstances, forecloses a later challenge to the admissibility of evidence. *See, e.g., Allied International, Inc. v. International Longshoremen's Ass'n,* 814 F.2d 32, 39–40 (1st Cir.), *cert. denied,* —— U.S. ——, 108 S.Ct. 79, 98 L.Ed.2d 41 (1987); *see also* Fed.R. Evid. 103(a)(1) ("Error may not be predicated upon a ruling which admits ... evidence unless a substantial right of the party is affected, and ... a timely objection or motion to strike appears of record...."). In this instance, appellant confesses and avoids. It acknowledges that no contemporaneous objection was interposed, but says that the need for one was abated because it registered its opposition to the admission of Cobb's statistical analysis by means of a pretrial motion *in limine.* We are not persuaded.

We review the chronology of pertinent events. Before commencement of trial, PMC filed a blunderbuss motion to ban the testimony of nine former PMC officials as to the causes of such officials' separation from service. That motion included a prayer that "plaintiff be barred from introducing any document listing persons who have ... ended their employment with Package Machine[ry], as well as any statistical comparison based upon such document." Dr.

Cobb was not specifically mentioned.[3] The district court granted the motion in part, prohibiting the ennead of departed workers from testifying in Freeman's case in chief as to the circumstances of their respective terminations. The court declined, however, to embargo all such evidence. It indicated that it would "permit plaintiff's expert, *subject to the establishment of a proper foundation,* to testify as to defendant's employment practices in general" (emphasis supplied).

When Cobb was called to the stand during trial, the court allowed plaintiff's counsel to adduce the expert's qualifications and to take his best shot at laying the foundation for the desired testimony. Before any opinion evidence was elicited, the court allowed defense counsel to conduct an extensive voir dire "as to expertise and foundation." When that examination was completed, the court ruled, without discernible objection, that the witness was qualified and that, in general, a foundation had been laid. Only then did plaintiff's counsel begin his inquiry into the witness's calculations and opinions. That testimony—which consumed the remainder of Cobb's direct—came in entirely without objection. (The transcript shows that defense counsel objected but once during the entire balance of the direct; that particular objection was sustained.) The next day, Dr. Cobb underwent rigorous cross-examination, followed by relatively brief redirect and recross. There was no motion to strike.

Given the circumstances, we think it clear that any error in the introduction of the statistical evidence was waived. We have previously admonished litigants to "exercise caution in relying exclusively upon rulings made in connection with pretrial motions *in limine* as the basis for preserving claims of error in the admission and exclusion of evidence." *Conway v. Electro Switch Corp.,* 825 F.2d 593, 596 n. 1 (1st Cir.1987) (*Conway I*); *see also Unit-*

ed *States v. Griffin,* 818 F.2d 97, 105 (1st Cir.) (in order to "preserve for review the claim of improperly constructing the Rule 403 balance, a party must obtain the order admitting or excluding the controversial evidence in the actual setting of the trial"), *cert. denied,* —— U.S. ——, 108 S.Ct. 137, 98 L.Ed.2d 94 (1987); *Adams v. Fuqua Industries, Inc.,* 820 F.2d 271, 274 (8th Cir.1987) ("motion in limine does not preserve error [in subsequent admission of evidence] for appellate review"); *cf. Luce v. United States,* 469 U.S. 38, 41, 105 S.Ct. 460, 463, 83 L.Ed.2d 443 (1984). While we do not insist that a party be precise to the point of pedantry, one seeking to exclude evidence must generally make a contemporaneous objection to the proof when and as proffered (or be excused from doing so by the trial judge).

To be sure, there may be instances where a trial court's ruling on an *in limine* motion, taken in context, is definitive enough to excuse omission of an objection on the point at trial. *See, e.g., American Home Assurance Co. v. Sunshine Supermarket, Inc.,* 753 F.2d 321, 324 (3d Cir.1985). But that is not our case. Here, appellant's pretrial assertions were couched in sweeping generalities. Insofar as those assertions implicated Cobb's opinions at all it was—as the district judge perspicaciously noted—impossible to gauge their validity until an actual attempt had been made to lay a foundation under Fed.R.Evid. 703. Whether the witness's testimony was or was not properly admissible could sensibly be judged only in the milieu of the trial proper. As we have said, "it is too great a handicap to bind a trial judge to a ruling on a subtle evidentiary question ... outside a precise factual context." *Griffin,* 818 F.2d at 104.

After the foundation evidence was received, it was by no means clear whether PMC continued to object to the statistical evidence—or if so, on what grounds. If

---

**3.** PMC filed a separate pretrial motion for an order barring plaintiff from introducing expert testimony—a motion in which Dr. Cobb was specifically named. That motion did not go to the substance of the proposed testimony, but instead sought to preclude the evidence under the authority of Fed.R.Civ.P. 16(f), complaining of what defendant perceived to be Freeman's "dilatory, incomplete and inconsistent [discovery] responses ... in breach of the court's pretrial scheduling order." We deal separately with that lament. *See infra* Part I(D)(4).

dissatisfaction remained, specific objections should have been voiced then, or taken as the critical questions were propounded. *See id.* at 105; *Petty v. Ideco, Div'n of Dresser Industries Inc.*, 761 F.2d 1146, 1150 (5th Cir.1985) ("a party whose motion *in limine* is overruled must renew his objection when the error he sought to prevent is about to occur at trial"). At the very least, a general objection should have been asked for, and preserved, as to the line of inquiry in its totality. No such step was broached. The omission cannot easily be overlooked: the importance of a contemporaneous objection is at its zenith in a situation such as this, where defendant's *in limine* motion invoked Fed.R.Evid. 403. The balancing calculus which that rule demands is peculiarly "subject to change when the case unfolds." *Griffin*, 818 F.2d at 104 (*quoting Luce*, 469 U.S. at 41, 105 S.Ct. at 463).

Appellant flouted these basic tenets in an egregious manner. It expressed no clear dissatisfaction with either the pretrial ruling or the ruling which followed voir dire. Thereafter, it neither requested a general exception to the line of inquiry nor otherwise sought to be relieved from the duty of objecting as questions were posed. Defense counsel allowed repeated opportunities for objection to pass unremarked while Cobb testified. PMC did not seek to strike the testimony when given, or at the end of Cobb's tenure on the stand, or at the close of plaintiff's case in chief. It did not move for a mistrial on the ground that the testimony had unduly prejudiced the jury. It eschewed any directed verdict motion. *See infra* Part I(F). In short, having failed in its preliminary effort to gain a blanket exclusion of all material anent terminations of other executives, defendant sat back upon its corporate haunches. Its laxity, we think, constituted a waiver of its right to raise this issue on appeal. As we have observed in a kindred context: "The law ministers to the vigilant, not to those who sleep upon perceptible rights." *Puleio v. Vose*, 830 F.2d 1197, 1203 (1st Cir.1987), *cert. denied*, — U.S. —, 108 S.Ct. 1297, 99 L.Ed.2d 506 (1988).

■ 2. *Admissibility.* Although the failure to object is dispositive, we add that we would be disinclined to second-guess the trial judge on this matter even if an exception had properly been preserved. Fittingly, the district courts are accorded broad discretion in admitting or excluding expert testimony. *Salem v. United States Lines Co.*, 370 U.S. 31, 35, 82 S.Ct. 1119, 1122, 8 L.Ed.2d 313 (1962); *Allied International*, 814 F.2d at 40; *United States v. Fosher*, 590 F.2d 381, 382 (1st Cir.1979). By and large, issues such as Cobb's degree of familiarity with cases of this kind and the reliability of his analysis affect not the *admissibility* of his testimony, but the *weight* which the jury might choose to give to it. *See Payton v. Abbott Labs*, 780 F.2d 147, 155 (1st Cir.1985).

We have read the transcript of Cobb's testimony with care. We note, particularly, Cobb's insistence that his analysis was based upon a complete and highly relevant statistical universe. He had scrutinized the lists of discontinued employees and their replacements (limited, as we have said, to high-ranking officers who separated from service after 1965). According to the professor, this 18-person universe did not suffer from the usual problems accompanying exiguous samples because it was not a "sample"; rather, it constituted the entire roster of employees terminated while in positions comparable to Freeman's. Cobb testified that statisticians would ordinarily rely upon precisely that kind of information in reaching conclusions about discrimination. That opinion, coming from a witness whose qualifications had passed the district court's entry-level muster, was entitled to weight—especially since defendant called no statistician or other expert to espouse the opposite view.

Cobb was equally untroubled by the fact that his figures had not been sorted to reflect whether departures were free or forced. To the professor's educated glance, causation—like beauty—lay all too often in the eye of the beholder. The circumstances surrounding terminations at PMC, he explained, were in dispute; frequently, they might be characterized differently by the protagonists. To cite an in-

stance close to home, the "official" termination notice issued by the company in Freeman's case stated that he had resigned voluntarily. Moreover, Putnam testified that PMC routinely recorded officers' terminations as voluntary, whatever the underlying facts. Therefore, Cobb felt it wise (and professionally prudent) to limit his analysis to undisputed data, avoiding assumptions about the reasons for termination. Rather than attempting to resolve the parties' disagreements over individual cases, Cobb visualized the statistician's task as examining the aggregate figures and determining whether they were consistent with Freeman's explanation, PMC's, or neither. He testified flatly—and without direct contradiction—that this form of analysis was "not at all unusual" among expert statisticians, and that it was "fairly conventional for statisticians to stay away from the claimed reason" for termination.

This foundation, we believe, was adequate. The district court has some latitude in the admission or exclusion of evidence, *see, e.g., Kelley v. Schlumberger Technology Corp.*, 849 F.2d 41, 45 (1st Cir.1988); *United States v. Tierney*, 760 F.2d 382, 387–88 (1st Cir.), *cert. denied*, 474 U.S. 843, 106 S.Ct. 131, 88 L.Ed.2d 108 (1985), and we are satisfied that the decision to permit Cobb to offer opinion evidence fell within the parameters of its discretion. We are likewise content with the court's decision to allow Cobb to use the undifferentiated termination lists. And from that point on, the matter was for the jury. The witness was cross-examined vigorously and at length. The district court afforded appellant great leeway in its attempts to demonstrate ostensible flaws in Cobb's analysis and shortcomings in the data which he employed. PMC—in the twin view of jury and trial judge—did not succeed. We discern no error.

We similarly reject PMC's argument that the trial court's reception of Cobb's testimony created a "trick box" for the company. Plaintiff had originally planned to call as a witness one Thomas Garde, a PMC vice president who was discharged at age fifty-five and brought an age discrimination suit (which was eventually settled).

As we have reported, *see supra* at 1336–1337, PMC moved prior to trial to exclude all testimony of discharged employees. Among other points, it argued that such evidence would force it to conduct a series of "mini-trials" concerning the propriety of each termination. The district court excluded the direct testimony of discharged employees as more prejudicial than probative, but allowed Freeman to introduce statistical evidence as long as he could lay a suitable Fed.R.Evid. 703 foundation (showing in effect, that the data was of the type on which experts in the field would reasonably rely). *See supra* at 1337. Appellant made no contemporaneous objection to this ruling.

PMC now asserts that the district judge's admission of statistical evidence gave plaintiff a "back-door route" to introduce inherently prejudicial evidence about former employees. The record, however, does not support the assertion. Plaintiff's direct and redirect examinations of Cobb contained no mention of the particular circumstances in other cases. To the contrary, Cobb repeatedly stated that he could testify only as to aggregate statistics, and could make no judgments regarding the circumstances of individual discharges. (He viewed such judgments as unnecessary for purposes of his analysis.) Nevertheless, in order to discredit Cobb's figures, appellant ruminates that it would have had to introduce evidence showing that each personnel decision was either voluntary or justified. That may be so, but the conclusion which appellant draws—that the evidence should therefore have been barred—does not follow from the premise. Evidence need not be mothballed merely because its admission will place some undesired burden on the opponent to rebut or undermine it. After all:

> The fact that a piece of evidence hurts a party's chances does not mean it should automatically be excluded. If that were true, there would be precious little left in the way of probative evidence in any case.

*Onujiogu v. United States*, 817 F.2d 3, 6 (1st Cir.1987). There was no impermissible unfairness inherent in allowing this proof.

Moreover, PMC received an altogether adequate opportunity to refute plaintiff's statistical proffer, and to dispute the conclusions drawn therefrom. Cobb candidly admitted that the "terminations" in his calculations were not necessarily forced. He acknowledged that some or all could have been voluntary quits, early retirements, or the like. PMC's extensive cross-examination brought this lacuna into sharp relief. The jury, we think, was the proper venue for resolving the significance (if any) of the omission. Additionally, defense counsel—despite their jeremiad on appeal—never asked to be exempted from the pretrial order issued at their instigation which barred evidence of the circumstances anent the departures of other high-ranking officers.[4] They made no effort to cross-question Cobb on the specifics of any individual exodus. They did not try to offer such evidence in the defense case. They can advert to no ruling at trial which prevented defendant from introducing evidence on the circumstances of particular terminations to impeach plaintiff's statistics. In short, to the extent that PMC was caught in a trick box—and we do not suggest that was the case—it was a trick box of its own design and construction, and from which it made no appropriate attempt to escape.

3. *Rule 403.* We need not linger unduly over defendant's argument that the district court erred in admitting the statistical evidence because of its inflammatory effect. "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice...." Fed.R.Evid. 403. Where, as in this case, the trial court determines evidence to be relevant, Fed.R.Evid. 104(a), it "has wide discretion in steadying the Rule 403 seesaw." *Onujiogu v. United States,* 817 F.2d at 6 (collecting representative First Circuit cases). Only rarely —and in extraordinarily compelling circumstances—will we, from the vista of a cold appellate record, reverse a district court's on-the-spot judgment concerning the relative weighing of probative value and unfair effect. *Id.; see also United States v. Tierney,* 760 F.2d at 388. This is not such an instance.

■ 4. *Obfuscatory Discovery Practices.* Appellant's animadversions anent appellee's allegedly atrocious discovery practices generate far more heat than light. In the last analysis, these lamentations seem baseless. We explain briefly.

In terms of notice, Freeman listed Cobb as a witness in a pretrial memorandum filed and served in April 1987—more than two months before trial. Appellant claimed dilatoriness, or worse, and sought exclusion on this ground. *See supra* note 3. The district court did not find that bad faith or willfulness underlay the timing. Nor did it find significant prejudice: PMC deposed Cobb before trial began; it has made no specific showing of harm resulting from the discovery schedule; our perscrutation of the record brings none to light; and the docket reflects no motion for a continuance to allow PMC to meet the testimony more adroitly. In point of fact, appellant's thorough and detailed cross-examination of the witness belies any serious

---

4. The pretrial order granting defendant's motion *in limine* prohibited the other officials from testifying as to the causes of their respective departures *only* during plaintiff's case in chief. Furthermore, the trial judge was apparently willing to relax his *in limine* ruling in light of Cobb's direct examination. When PMC began to cross-examine the professor concerning the identity of employees listed as voluntary or involuntary terminations, and their number, plaintiff objected on the ground that the issue was "something that ... [the court] ruled we weren't going to get into." The court overruled the objection, telling plaintiff's counsel:

Well, you have him qualified as a statistician to render an opinion on this pattern of age

discrimination. If in fact this part of the cross-examination proves that the statistics given to him were improperly used and given, that goes to his credibility.

After that ruling, PMC clearly was free to delve into the circumstances of individual cases, and use the evidence to impeach plaintiff's aggregate figures. Its failure to extend the line of questioning can only be attributed to a conscious tactical choice on the part of its counsel. Thus, even if we were to accept appellant's argument that admitting statistics while excluding particulars would constitute error, no such error was committed here.

suggestion that defendant had inadequate time to prepare.

These findings, and the court's denial of the Rule 16(f) motion, appear supportable. The district court has considerable discretion in policing alleged discovery transgressions. *See National Hockey League v. Metropolitan Hockey Club, Inc.*, 427 U.S. 639, 642, 96 S.Ct. 2778, 2780, 49 L.Ed.2d 747 (1976). That discretion extends to the banning of witnesses. *See* Fed.R.Civ.P. 37(b)(2)(B). But preclusion is a grave step, and by no means an automatic response to a delayed disclosure. *E.g., United States v. Sumitomo Marine & Fire Ins. Co.*, 617 F.2d 1365, 1369 (9th Cir.1980) (order excluding evidence should not be imposed where failure to make discovery not willful). In this case, declining to impose so extreme a sanction was well within the district court's discretionary authority. Indeed, appellant's billingsgate, as opposed to Freeman's conduct during pretrial discovery, seems to us the more obfuscatory.

5. *Recapitulation.* In sum, we find that Dr. Cobb's testimony was properly before the jury in this instance. Its weight and value, of course, were for factfinders to assess, not for counsel or the court imperiously to dictate. But as we turn to the appellant's core contentions—that the jury reached a seriously erroneous result and that the veteran district judge made much the same mistake in allowing the liability verdict to stand—we must factor Cobb's evidence into the mix.

E. *The Weight of the Evidence.*

■ After scrupulous examination of the whole of the record below, we cannot say that the weight of the evidence clearly countervailed the jury verdict. While we are inclined to agree with the district court's characterization of Freeman's case as "weak," we also accept its conclusion that the case was not so weak as to be infirm. Some weakness, after all, is to be expected in cases like this. It is rare to find smoking-gun evidence of discrimination charges. *See Conway I*, 825 F.2d at 597. Freeman's case, albeit circumstantial, had sufficient substance to allow a jury to resolve it. The evidence which he proffered to discredit PMC's stated rationale for firing him was adequate, we think, to place the matter in issue. That the company's evidence seemed stronger, or stemmed from a greater variety of sources, was food for the jury's thought—not for our consumption on appeal, after both jury and trial judge declined to accept it as controlling. Although the record would plainly have supported acceptance of the company's articulated reason for Freeman's discharge, the district court was not required, as a matter of law, to grant appellant a new trial because of this evidence.

Despite the fact that we find the evidence as to job performance sufficiently conflicted, our task is not completed. As in Title VII cases, the claimant needed to show more than that his employer miscalculated in deciding that he had outlived his corporate usefulness: good-faith errors in an employer's business judgment are not the stuff of ADEA transgressions. *See Keyes*, 853 F.2d at 1026; *see also Gray v. New England Telephone and Telegraph Co.*, 792 F.2d 251, 255 (1st Cir.1986) (plaintiff must show more than "that the employer made an unwise business decision, or an unnecessary personnel move.... [or] acted arbitrarily or with ill will"); *Dea*, 810 F.2d at 16; *Loeb*, 600 F.2d at 1012 n. 6. ADEA does not stop a company from discharging an employee for any reason (fair or unfair) or for no reason, so long as the decision to fire does not stem from the person's age. And the most attenuated link in the chain in this case, without doubt, was whether plaintiff had proven that age—as opposed, say, to Weisend's animosity, or envy of Freeman's celebrity within SPI, or a garden-variety mistake in corporate judgment as to Freeman's continued utility—was responsible for the ouster.

The direct evidence of age discrimination was scant, amounting to little more than Weisend's observation that Freeman was "slowing down" in 1980. By itself, this isolated phrase falls far short of meeting plaintiff's burden and establishing that defendant's stated reason was a coverup for age discrimination. But the opinion evidence offered by Cobb must also be con-

sidered. Although the question is close, we rate Cobb's testimony sufficient to show—arguably—that PMC's explanation was designed to mask age bias.

Statistical evidence is permissible on the issue of pretext in a disparate treatment case since "statistics as to ... employment policy and practice may be helpful to a determination of whether [the employer's conduct] conformed to a general pattern of discrimination ..." *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 805, 93 S.Ct. 1817, 1825, 36 L.Ed.2d 668 (1973). *See also* B. Schlei & P. Grossman, *Employment Discrimination Law* (M. Dichter & D. Cathcart Supp.1987) at 159 ("pretext can be established by direct evidence of discrimination, comparative evidence, statistical evidence, or a combination of the three") (footnotes omitted).[5] Here, Cobb testified that, having analyzed information on the eighteen presidents and vice presidents leaving PMC since 1965, he found a "pattern in the data" that was "totally consistent with a practice of age discrimination." Only one executive in the group stayed with PMC until normal retirement age; the others, on average, were in their fifties when terminated; and their replacements, as a group, were significantly younger. The departed executives typically had worked at PMC for upward of fifteen years. Given such long service to the company, it was Cobb's opinion—reasonably held, we think—that "these were not peo-ple who simply didn't work out." Cobb went on to state that the pattern at PMC was "totally consistent with age discrimination and the data offer no other explanation."

That testimony, if accepted by the fact-finder (as it evidently was), appears adequate, in conjunction with the remainder of the proof, to cast a pall over the authenticity of the asserted reason for the firing and likewise to suggest that a pattern or practice of age discrimination was in ignoble operation. That result obtains, we suggest, despite PMC's insistence that Weisend—not Putnam—was the decisionmaker vis-a-vis Freeman. The inquiry into a corporation's motives need not artificially be limited to the particular officer who carried out the action. *Cf. Conway I,* 825 F.2d at 597–98 (discussing admissibility of evidence showing "institutional state-of-mind" in discrimination cases). In this case, there was evidence that Putnam was a pervasive policy-making presence; few things of consequence happened at PMC if he wished them to be otherwise. The battle plan of the admiral is a valid datum in assessing the intentions of the captain of a single ship in the flotilla.

We are left with the conviction that, in this case, both facets of the pretext inquiry were jury questions. The liability aspect of the appeal can, therefore, be encapsulated in but a single sentence. We think neither

---

5. Appellant relies heavily upon cases such as *Simpson v. Midland-Ross Corp.,* 823 F.2d 937, 943 (6th Cir.1987), in which the court concluded that statistical evidence based upon a 17–person sample lacked sufficient probative value to support a verdict in an age discrimination suit. When the probative weight of a particular expert's testimony is at issue, however, other reported cases have limited applicability. The usefulness of statistics "depends on all of the surrounding facts and circumstances." *Id.* at 944 (quoting *Teamsters v. United States,* 431 U.S. 324, 340, 97 S.Ct. 1843, 1857, 52 L.Ed.2d 396 (1977)). Even small samples are not *per se* unacceptable. *See Fudge v. Providence Fire Dep't,* 766 F.2d 650, 658 (1st Cir.1985) ("in cases involving a narrow data base, the better approach is for the courts to require a showing that the disparity is statistically significant, or unlikely to have occurred by chance, applying basic statistical tests as the method of proof") (footnote omitted). The probative worth of sta-tistical testimony must be evaluated in light of the methodology employed, the data available, and the factual mosaic unique to the case at hand. *Cf. Chang v. University of Rhode Island,* 554 F.Supp. 1203, 1206 (D.R.I.1983) (death and taxes, arguably, may be certain; conclusions drawn from statistical evidence in discrimination cases rarely are). And the instant case has distinguishing features. For one thing, Cobb did not use a "sample" at all; he used the whole of what he, as an expert adjudged qualified by the trial court, determined to be the relevant statistical universe. Moreover, Cobb testified that his methodology was common among statisticians and yielded valuable results when applied to the data. Then, defendant allowed the testimony to go unrebutted. All in all, criticisms such as those voiced by PMC are in this situation best categorized as fodder for cross-examination or rebuttal at trial, rather than for appellate review.

that justice miscarried nor that the district judge misused his discretion in declining to grant appellant a new trial.

### F. *The Motion for Judgment Notwithstanding the Verdict.*

■ The conclusion that the evidence justified rejection of an unconditional new trial, *see supra* Part I(E), renders moot PMC's wishful assignment of error concerning the denial of its posttrial motion for judgment notwithstanding the verdict, Fed.R.Civ.P. 50(b). We note first that appellant neglected to move for a directed verdict either at the close of Freeman's case or at the close of all the evidence. This omission is not a fribbling one: Rule 50(b) makes a timely directed verdict motion a prerequisite for consideration of a motion for judgment n.o.v. We have construed the requirement stringently, although permitting a rare exception where there has been substantial (albeit not literal) compliance. *See Della Grotta v. State of Rhode Island,* 781 F.2d 343, 349–50 (1st Cir.1986); *Martinez–Moll v. Levitt & Sons,* 583 F.2d 565, 569–70 (1st Cir.1978); *Bayamon Thom McAn, Inc. v. Miranda,* 409 F.2d 968, 971–72 (1st Cir.1969).

PMC claims that it fits within these constricted confines because it tendered the "functional equivalent" of a directed verdict motion. We decline the invitation to push deeply into this bramble. The substantive predicate necessary to sustain a motion for judgment n.o.v. is at least as demanding as that needed to justify a new trial. *See, e.g., Wagenmann v. Adams,* 829 F.2d 196, 200–01 (1st Cir.1987) (discussing alternative standards). Because appellant has not met the new trial test, *see*

*supra* Part I(E), it is evident that, even if its j.n.o.v. motion was not procedurally defaulted—a point on which we offer no opinion—its claim of Rule 50(b) error would be unavailing.

## II. PREJUDGMENT INTEREST

■ The district court awarded Freeman prejudgment interest at a 12% rate from date of suit to entry of judgment. Appellant argues that interest under the ADEA was foreclosed because plaintiff did not request the court to submit the issue to the jury. *See Kolb v. Goldring, Inc.,* 694 F.2d 869, 875 (1st Cir.1982); *cf. Segal v. Gilbert Color Systems, Inc.,* 746 F.2d 78, 83–84 (1st Cir.1984). But the district court did not purport to invoke ADEA in this respect; rather, it awarded prejudgment interest pursuant to state law.[6] In view of the procedural posture of this case, we think that an award of interest on appellee's successful state-law claim was within the court's discretion.

Prior to trial, PMC moved to strike Freeman's jury demand on the state cause of action. The district court decided that, while Chapter 151B affords plaintiffs no right to a jury trial on age discrimination claims, it gives courts discretion to submit all, or part, of such cases to a jury. Without objection from either side, the judge ruled that he would submit the ADEA count to the jury and thereafter receive evidence, jury-waived, on damages available under Massachusetts law (but not under ADEA). In his June 29, 1987 memorandum, the judge recounted his agreement with counsel that "[t]he jury's determination on liability and back pay damages

---

**6.** The relevant state statutes provide in material part as follows:

It shall be an unlawful practice:

\* \* \* \* \* \*

For an employer in the private sector ... because of the age of any individual, to refuse to hire or employ or to bar or to discharge from employment such individual, or to discriminate against such individual in compensation or in terms, conditions or privileges of employment, unless based upon a bona fide occupational qualification.

Mass.Gen.L. ch. 151B, § 4(1B). Redress for a violation of § 4(1B) may include, "but [is] not

limited to, hiring, reinstatement or upgrading of employees, with or without back pay...." Mass.Gen.L. ch. 151B, § 5. Although interest is not specifically mentioned as a designated remedy, a different provision of Massachusetts law stipulates that:

In any action ... for pecuniary damages for personal injuries to the plaintiff or for consequential damages, or for damage to property, there shall be added by the clerk of court to the amount of damages interest thereon at the rate of twelve percent per annum from the date of commencement of the action....

Mass.Gen.L. ch. 231, § 6B.

were to be conclusive for the Chapter 151B count." *Freeman v. PMC,* Civ. No. 83–0403–F, memorandum & order (D.Mass. June 29, 1987), at 1 [1987 WL 49529]. Following the jury verdict, the judge heard the incremental evidence. He then made a supplemental damage award, holding that Freeman was entitled, dollar for dollar, to the same damages on the state-law count as under the ADEA, plus $5000 for emotional distress (an element of damages available only under Massachusetts law). Accordingly, the judge noted that "[p]laintiff's total recovery for defendant's violation of Mass.Gen.Laws ch. 151B" was equal to the aggregate amount of the jury's damage award, plus the $5000 increment.[7] *Id.* at 2.

Although Chapter 151B does not explicitly provide for awards of prejudgment interest, *see supra* note 6, the law grants the Massachusetts Commission Against Discrimination (MCAD) "broad authority ... to remedy the wrongs of discrimination, and this authority extends to awarding interest to make discrimination victims whole for their injuries." *New York and Massachusetts Motor Service, Inc. v. MCAD,* 401 Mass. 566, 517 N.E.2d 1270, 1280 (1988); *see also College–Town v. MCAD,* 400 Mass. 156, 508 N.E.2d 587, 595 (1987). In response to questions certified from this court, the Massachusetts Supreme Judicial Court (SJC) has confirmed that, in a private action under Chapter 151B, "the award of interest may be used to make the aggrieved party whole." *Conway v. Electro Switch Corp.,* 402 Mass. 385, 523 N.E.2d 255, 258 n. 7 (1988) (*Conway II*). Although the certified questions involved "front pay" awards for lost future earnings and the propriety of awarding prejudgment interest thereon, the court's

analysis left no doubt that interest awards are a proper palliative in respect to past damages, such as those claimed by Freeman in the instant case. *See id.* More importantly, the SJC stressed both the "fundamental proposition" that interest should be "awarded to compensate a damaged party for the loss of use or the unlawful detention of money," *id.* 523 N.E.2d at 258, and the legislature's directive that Chapter 151B "be construed liberally for the accomplishment of the purposes thereof." *Id.* 523 N.E.2d at 256 (quoting Mass. Gen.L. ch. 151B, § 9). The SJC's rendition of *Conway II* makes it plain, therefore, that trial courts have discretion to restore plaintiffs to their original position by granting prejudgment interest on backpay awarded pursuant to Chapter 151B.[8]

State law notwithstanding, PMC asseverates that federal courts must follow federal law on prejudgment interest when confronted with parallel state and federal discrimination claims in a nondiversity case. In support thereof, it cites our decisions in *Conway I,* 825 F.2d at 602, and in *Wojtkowski v. Cade,* 725 F.2d 127, 129 (1st Cir.1984). But appellant reads the caselaw far too restrictively. In *Conway I,* we pointed to the broad discretion given to a district court "as a matter of state and federal law, to formulate an interest award which it believe[s] would make the plaintiff whole." 825 F.2d at 602. We held that, when a plaintiff had succeeded on interrelated federal and state claims, the trial court did not abuse its discretion by choosing to compute prejudgment interest based on the lower, federal rate. *Id.* In *Wojtkowski,* the jury returned a general verdict based upon federal and pendent state claims. We applied federal law to deny

---

7. The district court ruled that plaintiff, although entitled to the same damages under both federal and state statutes, could collect them but once. And the district court, in trimming the verdict, required the remittitur to be made across the board. Freeman does not contest either of these rulings.

8. In computing interest under ch. 151B, MCAD has customarily calculated interest from the date of the complaint, *see Franklin Publishing Co. v. MCAD,* 25 Mass.App. 974, 519 N.E.2d 798,

800 (1988), and has used the 12% rate made applicable to personal injury actions by Mass. Gen.L. ch. 231, § 6B. *See New York and Massachusetts Motor Service,* 517 N.E.2d at 1280; *College–Town,* 508 N.E.2d at 595. In *Conway II,* 523 N.E.2d at 258 & n. 7, the SJC observed that interest was awarded in these cases at 12% as an appropriate exercise of agency discretion, and declined to offer an advisory opinion as to how courts might best calculate interest on damages assessed in pursuance of ch. 151B, § 9.

prejudgment interest, largely because "all claims, both federal and state, were sent to the jury together, resulting in a general verdict," and we "cannot tell to what extent, if any, the jury's awards of damages ... were based on the state law claims." 725 F.2d at 129. We suggested, but did not decide, that the plaintiff would have been entitled to prejudgment interest on the state claims if the jury had returned separate verdicts. *Id. See also Aubin v. Fudala,* 782 F.2d 287, 289 (1st Cir.1986) (distinguishing *Wojtkowski* on similar grounds).

■■ Where, as here, a state claim is decided by the court and a federal claim by the jury, an award of prejudgment interest on the former is not barred so long as state law allows it. *Cf. Aubin,* 782 F.2d at 289 (where "jury verdict based on state law, the law of that state governs the award of prejudgment interest"). Since the entitlement to prejudgment interest in this case derives from the text of Chapter 151B and the judicial gloss interpreting the statute, it is part of the substantive right created by state law. *See Hobart v. O'Brien,* 243 F.2d 735, 745 (1st Cir.), *cert. denied,* 355 U.S. 830, 78 S.Ct. 42, 2 L.Ed.2d 42 (1957) (Mass.Gen.L. ch. 231, § 6B, *quoted supra* note 6, comprises substantive state law applicable in diversity); *Harmon v. Clark Equipment Co.,* 657 F.Supp. 873, 874 (D.Me.1987) (to like effect). We agree with the Second Circuit that state law governs prejudgment interest vis-a-vis state claims, even when the basis for the district court's jurisdiction stemmed originally from the presence of a federal question. *Mallis v. Bankers Trust Co.,* 717 F.2d 683, 692 n. 13 (2d Cir.1983). Because the relevant state-law claim here (Chapter 151B) was tried to the bench, the district judge, after adopting the jury's liability finding, was at liberty to award additional remedies which were (1) supported by the record, and (2) available under state law. *See Schroeder v. Lotito,* 747 F.2d 801, 802 (1st Cir.1984) (per curiam) (affirming district court's award of [a] lost profits under Rhode Island law though unavailable under federal law; and [b] attorneys' fees and costs under federal law though probably unavailable under state

law). The bestowal of prejudgment interest in this case was, we think, well within the district court's commodious state-law discretion under decisions such as *Conway II, New York and Massachusetts Motor Service,* and *College–Town,* all *supra,* to craft remediation that fits the circumstances and makes a particular plaintiff whole.

■ Nor does the fact that the damages held to be recoverable under Chapter 151B largely replicated those recoverable under the ADEA disqualify plaintiff from receipt of prejudgment interest on the common portion of the award. To be sure, a plaintiff is entitled to only one full recovery, no matter how many different legal grounds may support the verdict, *see supra* note 7; but there is no basis for allowing the losing party to pick which of the overlapped awards it prefers to pay. In collecting the fruits of his victory, Freeman was concededly entitled to only a single slice of the pie—but the choice of the slice was his.

■ We also reject appellant's further contention that the court's interest award was duplicative because the plaintiff's actuarial expert covertly buried an interest factor in his calculation of lost earnings. The facts are these. PMC asked the actuary to explain how his figures were derived. The witness replied that he averaged Freeman's pay and bonus for the years 1976–80, and then increased the figure by six percent per year to account for projected pay raises. He said nothing about prejudgment interest, nor did he make allowances for the time value of money—which is what interest is all about. Certainly, the isolated reference by the actuary to $393,506 as representing the "present value" of plaintiff's lost earnings, standing naked and unadorned, does not compel a contrary conclusion.

The district court did not abuse its discretion in granting prejudgment interest to Freeman in connection with his proven state-law claim.

## III. FEES OF EXPERT WITNESSES

■ In addition to counsel fees and other costs, the district court ordered appel-

lant to reimburse Freeman to the tune of $7,756.25, representing the reasonable fees of his retained experts.[9] PMC argues that the award was contrary to the Supreme Court's decision in *Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 107 S.Ct. 2494, 96 L.Ed.2d 385 (1987). Because of the posture in which this appeal arises, we find it unnecessary to decide plaintiff's possible entitlement to such fees under federal law. The Commonwealth's statutory framework contains a sufficient answer to the question posed.

## A. *The Reach of Crawford.*

In federal jurisprudence, the shifting of litigatory expenses is generally governed by statute. *See, e.g.,* 28 U.S.C. § 1920 (costs taxable by court include "[f]ees and disbursements for ... witnesses"); 28 U.S. C. § 1821 ("Except as otherwise provided by law, a witness in attendance at any [federal] court ... shall be paid an attendance fee of $30 per day...."). In *Crawford Fitting Co. v. J.T. Gibbons, Inc., supra,* the Supreme Court explained that section 1821 limits the amount of witness fees awardable, and section 1920 allows a court to tax such fees as costs only within those limits. 107 S.Ct. at 2497–98. In the absence of statutory or contractual authorization for more generous payments, federal courts are constrained by the $30–per–day cap when ordering one side to pay for the other's expert witnesses. *Id.* at 2499.

*Crawford* involved an award to prevailing defendants covering expenses reasonably incurred for experts, bestowed under the authority of Fed.R.Civ.P. 54(d).[10] The Court concluded that Rule 54(d) must be administered in conjunction with existing statutes; therefore, the rule does not provide a separate source of limitless discretion to tax expert witness fees as costs. *Crawford,* 107 S.Ct. at 2497–98. Our pre-*Crawford* precedent under Rule 54 hewed to much the same line. *See Bosse v. Litton Unit Handling Systems,* 646 F.2d 689, 695 (1st Cir.1981) (in diversity case, expert's fees above statutory amount cannot be taxed under authority of Rule 54); *see also Templeman v. Chris Craft Corp.,* 770 F.2d 245, 249–50 (1st Cir.) (similar), *cert. denied,* 474 U.S. 1021, 106 S.Ct. 571, 88 L.Ed.2d 556 (1985).

Appellant asks that we treat this case as parading around the same old stamping ground and reduce the fees for plaintiff's experts drastically to conform with the section 1821 ceiling. The imprecation, however, is deceptively simplistic; in reality, PMC seeks not merely to enforce *Crawford,* but instead to elongate it beyond the contours of Rule 54, extending its holding to situations where express fee-shifting statutes apply.[11] The march is not an inevitable one; the *Crawford* majority clearly recognized that the $30 limit, 28 U.S.C. § 1821, could be superseded by "statutory or contractual authorization," if sufficiently explicit. 107 S.Ct. at 2499. *See also IWA v. Champion International Corp.,* 790 F.2d 1174, 1179 n. 7 (5th Cir.1986) (listing twenty-eight federal statutes authorizing award of expert witness fees), *aff'd sub nom. Crawford Fitting Co. v. J.T. Gibbons, Inc.,* 482 U.S. 437, 107 S.Ct. 2494, 96 L.Ed.2d 385 (1987); *cf. United States v. Metropolitan Dist. Comm'n,* 847 F.2d 12, 20 n. 10 (1st Cir.1988) (affirming award of expert witness fees under Federal Water Pollution Control Act, 33 U.S.C.

9. Appellee's motion sought to recover various other expense items as well. The court below honored many, but not all, of the requests. PMC's assignment of error, however, addresses only the matter of experts' fees.

10. The rule provides in pertinent part:

Except when express provision therefor is made either in a statute of the United States or in these rules, costs shall be allowed as of course to the prevailing party unless the court otherwise directs.

Fed.R.Civ.P. 54(d).

11. In *Crawford,* costs were awarded to prevailing defendants in (a) an antitrust case, and (b) an employment discrimination case. The Congressional policies supporting such awards are more muted than those which encourage civil rights enforcement by holding out the hope of relocating the financial burdens of litigation. *See Christiansburg Garment Co. v. EEOC,* 434 U.S. 412, 418, 98 S.Ct. 694, 698, 54 L.Ed.2d 648 (1978) ("strong equitable considerations" counseling award of attorneys' fees to prevailing Title VII plaintiff are "wholly absent" where defendant prevails).

§ 1365(d)). As three Justices pointed out in *Crawford,* the decision did not treat with awards to prevailing plaintiffs under the Fees Act, 42 U.S.C. § 1988. *See Crawford,* 107 S.Ct. at 2499 (Blackmun, J., concurring); *id.* at 2500 n. 1 (Marshall and Brennan, JJ, dissenting).

The ADEA, 29 U.S.C. § 626(b), expressly incorporates the fee-shifting mechanism of the Fair Labor Standards Act (FLSA), which provides that a court:

> shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action.

29 U.S.C. § 216(b). Insofar as cost-shifting is concerned, laws such as 29 U.S.C. § 626(b) and 42 U.S.C. § 1988 seem sisters under the skin. Most notably, the ADEA's legislative history reveals that Congress viewed it as similar to earlier, more traditional enactments. *See* H.Rep. No. 805, 90th Cong., 1st Sess., *reprinted in* 1967 U.S.Code Cong. & Admin.News at 2213, 2214. We agree that, "[a]lthough the Age Discrimination in Employment Act is not a civil rights act within the meaning of section 1988, age discrimination cases commonly cite section 1988 cases on fee questions." *Heiar v. Crawford County, Wisconsin,* 746 F.2d 1190, 1203 (7th Cir.1984); *cf. Wildman v. Lerner Stores Corp.,* 771 F.2d 605, 609–14 (1st Cir.1985) (adopting section 1988 analysis anent counsel fees in ADEA case). Therefore, section 1988 jurisprudence seems pertinent in considering recoverability of expenses in ADEA cases. And, because a federal "civil rights" type of statute containing a separate cost-shifting provision is at issue in this case, *Crawford,* without some further extrapolation, would not be directly controlling. *See, e.g., Sapanajin v. Gunter,* 857 F.2d 463, 465 (8th Cir.1988) (award of experts' fees in civil rights case proper because "not made as a taxation of costs pursuant to 28 U.S.C. § 1821, but as an expense under 42 U.S.C. § 1988 ... *Crawford Fitting* thus does not apply"); *but cf., e.g., Sevigny v. Dicksey,* 846 F.2d 953, 959 (4th Cir.1988) ("§ 1988 does not provide statutory authority for the awarding of compensation for non-legal experts").

### B. Cost–Shifting Under Massachusetts Law.

We have no occasion today to consider extending *Crawford* to a situation involving a prevailing ADEA claimant. As indicated above, *see supra* Part II, Freeman brought—and recovered on—parallel federal and state claims. Despite the doubt which *Crawford* casts over the district court's ability to award expert witness fees in excess of the $30–per–day ceiling under federal law, the rule of the case does not constrain state law. The Court's decision in *Crawford* emanated from, and was grounded in, the express limits imposed on witness fees by a federal statute, 28 U.S.C. § 1821. *See supra.* But Freeman recovered under state law as well as federal, and section 1821 has no analog in Massachusetts law that would apply in connection with Freeman's successful prosecution of his state-law claim. Thus, *Crawford* is inapposite to the latter recovery.

We explain briefly. In this case, Freeman moved for fees and costs under both federal and state law. The Commonwealth has granted explicit cost-shifting authority in Mass.Gen.L. ch. 151B, § 9.[12] "Costs," however, are neither enumerated nor defined therein. Unlike in federal law, there is no discernible cap: the amount of witness fees awardable as costs in Massachusetts is not limited to $30 per day, or to any other fixed sum. Rather: "In civil actions ... in which no provision is expressly made by law, the costs shall be wholly in the discretion of the court." Mass.Gen.L. ch. 261, § 13; *see also George v. Coolidge Bank & Trust Co.,* 360 Mass. 635, 277 N.E.2d 278, 282 (1971) (entitlement to, and amount of, expert witness fees wholly within court's discretion). Under state law, "where the award of costs is statutorily

---

**12.** The statute provides in pertinent part:
> If the court finds for the petitioner [in an employment discrimination action] it shall, in addition to any other relief ... award the petitioner reasonable attorney's fees and costs unless special circumstances would render such an award unjust.

Mass.Gen.L. ch. 151B, § 9.

authorized, judges are vested with discretion either expressly or by judicial construction in determining the size of the award." *Linthicum v. Archambault*, 379 Mass. 381, 398 N.E.2d 482, 489 (1979).

As with prejudgment interest, *see supra* Part II, the cost-shifting envisioned by Chapter 151B constitutes part of the substantive remedy created by state law, and applies when a federal court, having obtained jurisdiction, proceeds to hear and determine the state-law claim. *See, e.g., Pan American World Airways, Inc. v. Ramos*, 357 F.2d 341, 342 (1st Cir.1966) (Puerto Rico statute allowing assessment of attorneys' fees for "obstinacy" recognized in federal court "as a matter of substantive right"); *accord Marshall v. Perez Arzuaga*, 828 F.2d 845, 852 n. 10 (1st Cir.1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 1027, 98 L.Ed.2d 991 (1988). The statutory wording itself, the discretion invested by state statutes which are in *pari passu* with the cost-shifting provision, *e.g.*, Mass.Gen.L. ch. 261, § 13, and the judicial gloss placed upon the language by the SJC, *e.g., Linthicum*, 398 N.E.2d at 488; *George*, 277 N.E. 2d at 282, combine to import into the substantive state-law remedy an element of flexibility, both as to entitlement and amount. A prevailing plaintiff may receive expert witness fees in a Chapter 151B case if the court in its discretion chooses to award them, and in whatever sum the court deems reasonable. A federal court empowered to determine a state-law claim (whether by reason of diversity, pendent jurisdiction, or otherwise) must be accorded this same degree of flexibility.[13] *See Northern Heel Corp. v. Compo Industries, Inc.*, 851 F.2d 456, 475 (1st Cir.1988) (in diversity case, inasmuch as entitlement to counsel fees "comprised a substantive part of the state-law remedy for a state-law cause of action, the proper rule of decision governing the award should have been derived from Massachusetts, rather than federal"

law); *Bright v. Land O'Lakes, Inc.*, 844 F.2d 436, 444 (7th Cir.1988) (Wisconsin statute which authorized award of "actual costs of the action including reasonable attorney's fees" covered expenditures for expert witnesses, and applied in federal courts to override restrictions of 28 U.S.C. § 1821); *see also Blanchette v. Cataldo*, 734 F.2d 869, 878–79 (1st Cir.1984) (federal court may award reasonable fees and costs to successful claimant under state law, specifically, Mass.Gen.L. ch. 93A).

Although there is no Massachusetts case squarely on point, we view it as highly probable that the SJC would interpret section 9 as permitting courts to shift expert witness fees in favor of prevailing plaintiffs in age discrimination cases. The phraseology of the law intimates as much, and the law's objectives cinch the proposition. Insofar as enactment of the statute represents a legislative policy choice, it is a choice, we suggest, to furnish courts with a mandate "to ensure 'effective access to the judicial process' for persons with civil rights grievances." *Hensley v. Eckerhart*, 461 U.S. 424, 429, 103 S.Ct. 1933, 1937, 76 L.Ed.2d 40 (1983) (quoting H.Rep. No. 94–1558 at 1, 94th Cong., 2d Sess. (1976)). If citizens are to assert their state-ceded rights meaningfully in Massachusetts, and if those malefactors who would deny such rights are to be deterred, then prevailing plaintiffs should be given the chance to recover what it costs to enforce the rights in court. It would turn things topsy-turvy to saddle civil rights claimants—no matter how galling their deprivations or how vindicatory the outcome of their suits—with whopping fees for the services of expert witnesses. To leave prevailing plaintiffs unreimbursed for such expenditures might well make the game not worth the candle, surely disserving the ends of a cost-shifting rule.

---

**13.** We reject the asseveration that precedent such as *Bosse v. Litton Unit Handling Systems, supra*, requires a different result. *Bosse* holds that in a routine diversity case, federal law will govern the taxation of costs in the district court. 646 F.2d at 695. *See also Paul N. Howard Co. v. Puerto Rico Aqueduct & Sewer Auth.*, 110 F.R.D.

78, 80–81 (D.P.R.1986) (to like effect). These cases are inapposite where, as here, the prevailing party's entitlement is not dependent upon a state procedural provision of general applicability, but rather is an integral part of the substantive state-law remedy for a particular wrong.

That Massachusetts shares these sentiments is not much a matter of conjecture. The linchpin of our prophecy is the SJC's opinion in *Linthicum v. Archambault, supra.* *Linthicum* involved a consumer protection law, Mass.Gen.L. ch. 93A, which stipulated that successful plaintiffs "shall ... be awarded reasonable attorney's fees and costs...." Mass.Gen.L. ch. 93A, § 9(4). Notwithstanding the generality of the statutory reference, the SJC—with a weather eye to the purposes for which the law was enacted—discerned a presumption favoring the award of expert witness fees:

> The usual rule in Massachusetts is that the litigant must bear his own expenses.... Chapter 93A is a statutory exception to that rule. Although the award of expert witness fees is usually discretionary, *George v. Coolidge Bank & Trust Co.*, 360 Mass. 635, 640, 277 N.E.2d 278 (1971), we think that reasonable expert witness fees should normally be recoverable in a ch. 93A case in order to vindicate policies of the act. See generally Note, Expert Witness Fees: Protection for the Indigent Party, 48 Nw.U. L.Rev. 106 (1953).

*Linthicum*, 398 N.E.2d at 488.

We are confident that the SJC would interpret the cognate provision in Chapter 151B, § 9 in like fashion. Chapter 151B "is to be liberally construed to meet its goals." *Katz v. MCAD*, 365 Mass. 357, 312 N.E.2d 182, 187 (1974). The law's "clear purpose ... is to implement the right to equal treatment guaranteed to all citizens by the constitutions of the United States and the Commonwealth." *Id.* In shaping awards under Chapter 151B, Massachusetts courts have consistently adopted "the rationale that if there is to be a 'windfall', such benefit should accrue to the injured party rather than to the wrongdoer." *Buckley Nursing Home v. MCAD*, 20 Mass.App. 172, 478 N.E.2d 1292, 1299 (1985) (quoting

*Jones v. Wayland*, 374 Mass. 249, 262, 373 N.E.2d 199 (1978)). These principles bear eloquent testimony, we suggest, to the accuracy of a forecast that the SJC would, in an appropriate case, allow expert witness fees under Chapter 151B's cost-shifting provision as a necessary incident of litigation.[14]

### C. *Applying State Law.*

This is, we believe, an appropriate case. In our judgment, the district court had discretion to act under the state statute and exercised that discretion in an allowable manner. The fact that the district court made no explicit reference to the statute in its award is, we think, immaterial. The court indicated its awareness of Freeman's eligibility for the succor of state law in authorizing the filing of his fee-and-costs application. *See Freeman v. PMC*, Civ. No. 83–0403–F, memorandum & order, (D.Mass. June 29, 1987), at 2 [1987 WL 49529]. Plaintiff's ensuing petition invoked the Massachusetts statute and relied upon it as an alternative ground for reimbursement. Defendant's opposing memorandum vetted the point in some detail. Thus, the parties knew the issue belonged in the case and addressed it. Bearing in mind that this suit was originally filed in state court and removed to federal district court by PMC, there is no inequity in calling up the Massachusetts statute. A defendant who chooses to remove a case from a state forum to a federal one is hard put to complain if the federal court follows state practice in regard to state-law claims contained in the complaint.

Nor are we materially disadvantaged by the district court's approach. The fact that the judge awarded witness fees under the ADEA, without reaching the state-law question, should not deter us from considering the issue. An appellate court is not wed to a trial court's reasoning: "[W]e are

14. We are aware, of course, that the SJC, following *Alyeska Pipeline Serv. Co. v. Wilderness Society*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975), has held that MCAD lacks power to award counsel fees when the governing statute does not expressly authorize it to make such awards. *See Bournewood Hospital, Inc. v.* *MCAD*, 371 Mass. 303, 358 N.E.2d 235, 238–41 (1976). *Bournewood*, however, does not control. The instant proceeding is judicial rather than administrative, and is unmistakably subject to the cost-shifting mandate of ch. 151B, § 9. *See Bournewood*, 358 N.E.2d at 238.

free, on appeal, to affirm a judgment on any independently sufficient ground." *Polyplastics, Inc. v. Transconex, Inc.,* 827 F.2d 859, 860–61 (1st Cir.1987); *see also Chongris v. Board of Appeals,* 811 F.2d 36, 37 n. 1 (1st Cir.), *cert. denied,* —— U.S. ——, 107 S.Ct. 3266, 97 L.Ed.2d 765 (1987); *Casagrande v. Agoritsas,* 748 F.2d 47, 48 n. 1 (1st Cir.1984) (per curiam). Here, the court considered the appropriate factors and weighed them in an acceptable fashion, easily interchangeable in terms of the state-law/federal-law dichotomy. It referred to its award of the disputed sum as "costs"—which, in the argot of Chapter 151B, is the proper terminology. Nothing in the record suggests any intention to invoke Fed.R.Civ.P. 54(d) or any other peculiarly federal rule on court costs. To disallow the award because the trial judge did not specifically advert to the parallel state statute would mindlessly sacrifice substance on the altar of talismanic labelling.

Neither the size nor the composition of the award can successfully be questioned. The record reflects that the court below heeded the relevant considerations. *Cf. Northern Heel,* 851 F.2d at 476–77 (listing factors to be considered under Massachusetts fee-shifting statutes when setting counsel fees). The statements of experts' charges—there were two experts, Dr. Cobb and an actuary, William Massida—were not rebutted in any manner. The statistician's testimony was crucial to Freeman's case and the actuary's figures were important in computing damages. The charges seem modest by any measure; indeed, appellant has not claimed they were excessive.

By the same token, the award of experts' fees need not be shrunk to reflect a division of labor between federal and state claims. Theoretical possibilities aside, the sockdolager is this: Freeman's federal and state claims turn upon exactly the same facts and, with a relatively minor exception (emotional distress), involved proof of the same elements. Because the claims were inextricably intertwined, the expert wit-

nesses' time charges need not be prorated. *See Wagenmann v. Adams,* 829 F.2d 196, 225 (1st Cir.1987) (legal malpractice action "was so factually imbricated with the federal civil rights claims as to make separate treatment of the constituent attorney time inappropriate"); *Aubin v. Fudala,* 782 F.2d at 290–92 (if basic relief recovered on state claim, and state claim is "factually and legally interconnected" with federal civil rights claim, plaintiff would be entitled to attorneys' fees incurred in prosecution of both claims). Since (1) the district court found that the disputed expenditures were fair and reasonable, (2) that determination has not been challenged on appeal, (3) the interrelationship between the federal and state claims is so close-knit as to forestall the need for proration of the charges, and (4) PMC has cited no "special circumstances [which] would render such an award [of experts' fees] unjust," Mass.Gen.L. ch. 151B, § 9,[15] reimbursing plaintiff for the expenses was appropriate as a matter of Massachusetts law.

## IV. CONCLUSION

The jury's conclusion that plaintiff delivered loyal service in the employ of PMC and, for his pains, was dismissed because he had seen too many summers, is a sustainable one. Our review of the record reveals evidence adequate to uphold the liability finding. And as a matter of state law and the trial court's discretion, both prejudgment interest and reimbursement for experts' fees were allowable. Because that is so, we express no opinion on whether reimbursement for the expert witness fees could appropriately be made under the aegis of 29 U.S.C. § 216(b) or 29 U.S.C. § 626(b).

We need go no further. No reversible error appearing, the judgment below will be

**AFFIRMED. Costs to appellee.**

---

**15.** In moving for fees and costs in the district court under, inter alia, Chapter 151B, Freeman alleged the absence of special circumstances. His supporting memorandum made the same

claim. Defendant apparently conceded the point, as its lengthy response to the motion and memorandum was entirely silent on the subject.