Michael J. FOLEY, Plaintiff, Appellee,

v.

CITY OF LOWELL, MASSACHUSETTS,
Defendant, Appellant.

Michael J. FOLEY, Plaintiff, Appellant,

v.

CITY OF LOWELL, MASSACHUSETTS,
Defendant, Appellee.

Nos. 91–1016, 91–1044.

United States Court of Appeals,
First Circuit.

Heard Aug. 2, 1991.
Decided Oct. 23, 1991.

Robert LeRoux Hernandez, Malden, Mass., for plaintiff, appellee.

Patricia Sullivan Talty, Asst. City Sol., Lowell, Mass., for defendant, appellant.

Before TORRUELLA and SELYA, Circuit Judges, and HILL,* Senior Circuit Judge.

SELYA, Circuit Judge.

Invoking 42 U.S.C. § 1983 and also asserting pendent state-law claims, Michael J. Foley sued the City of Lowell and certain members of its police force in the United States District Court for the District of Massachusetts. Foley alleged in substance that his rights under the fourteenth amendment were violated when he was brutally beaten by police officers; that the City inadequately trained and supervised its constabulary; and that the City allowed the Lowell Police Department (Department) to operate under constitutionally offensive policies. After a ten-day trial, the jury returned a verdict against the City and one officer, Lamothe.[1] A judgment was entered on June 30, 1989. Several orders were thereafter signed, some of which purported to alter or modify the judgment. An amended judgment was entered on December 6, 1990. After several false starts, cross-appeals have been perfected.

The issues on appeal include whether the trial court (1) improperly admitted into evidence a particularly vile incident of subsequent police brutality, capped by an episode of unsolicited micturition, (2) erred in calculating prejudgment interest, (3) awarded appropriate counsel fees to the prevailing plaintiff, and (4) should have allowed post-judgment interest on the award of counsel fees. The last point requires that we decide a matter of first impression in this circuit.

Having captured the essence of this catamount of a case, we affirm the verdict. At the same time, we direct that the computation of prejudgment interest be corrected, that the second of the two fee awards made by the district court be modified slightly, and that postjudgment interest attach to the principal fee award.

## I. BACKGROUND

The plaintiff's parents owned and operated a variety store in Lowell. In the wee hours of February 5, 1983, the plaintiff discovered that the store had been vandalized. He called the police. Two or three officers came to the store, conducted an inspection, and left. Shortly thereafter, plaintiff's brothers spotted two young men in the vicinity. Suspecting that they had snared the culprits, the brothers brought the men inside the store and contacted the police again. This time, several members of the Department responded. Lamothe was one of them. The officers spoke with the detainees and concluded that there was no probable cause for arrest. The men were released.

For the Foleys, this was one straw too many. Various officers testified that the plaintiff's father, Thomas Foley, became indignant when the men were released. He approached Lamothe and berated him for freeing the supposed perpetrators. Lamothe responded in kind, becoming equally enraged. He reportedly accosted the plaintiff's father and yelled at him for trying to take the law into his own hands. Withal, Lamothe kept bumping Thomas Foley with his chest in a hostile and aggressive fashion. The plaintiff soon interceded, wedg-

---

* Honorable James C. Hill, of the Eleventh Circuit, sitting by designation

1. At various points in the record, Lamothe's name appears with the second consonant capitalized, i.e., "LaMothe." It is unclear which usage is correct. We elect to eschew the extra capital letter. Lamothe is not a party to the proceedings before us, his attempted appeal having previously been defaulted and dismissed. There is a suggestion that he has declared bankruptcy.

ing himself between his father and Lamothe.

The testimony was sharply conflicted as to what happened next. The officers' version was that Lamothe and the plaintiff struggled, wrestling each other to the ground. Finally, Lamothe was able to cuff one of plaintiff's hands. Another officer arrived momentarily, and the two of them secured the other hand. Once handcuffed, Foley was led to a police car and held there. No blows were ever inflicted upon him, although he resisted throughout.

The plaintiff's version was markedly different. He said that Lamothe grabbed him by the neck and repeatedly struck him in the face. His glasses were broken. He was then thrown to the ground. A group of officers hauled the plaintiff to his feet and took him to a police cruiser. There, his face was slammed into the side of the car. He fell to the ground and was kicked several times. Someone pulled him up by his hair and Lamothe struck him again. The pummelling continued in this fashion for an indeterminate interval before the plaintiff was handcuffed.

The rest of the story is undisputed. Foley was transported to headquarters by police van. His sister procured his release on bail and took him to a nearby hospital. Foley's face was black and blue. He was bleeding from his right ear. The urine sample he provided at the hospital had blood in it. Moreover, he was unable to speak; his voice did not return for two weeks.

## II. THE EVIDENTIARY ISSUE

At trial, the plaintiff endeavored to prove that his beating at the hands of Lamothe and his cohorts was not an isolated event, but rather, the product of a municipal policy and custom of studied indifference to the violation of constitutional rights by police officers. To this end, Foley presented a series of witnesses who laid various atrocities at the Department's doorstep.[2] The testimony suggested that the Depart-

ment routinely ignored complaints about the use of excessive force.

In the course of this parade, the district court allowed one Mark Finnegan to testify. Finnegan claimed to have been savaged by Lamothe in August 1983, some six months after Foley and Lamothe had crossed swords. According to Finnegan, Lowell police officers had arrested him and placed him in protective custody. During that time, Lamothe and others handcuffed him, hit him, kicked him, and threw him upside down into a trash barrel. While Finnegan was in the ashcan, Lamothe urinated on him.

Later in the trial, Finnegan's account was confirmed in material part by the testimony of Police Superintendent Sheehan, Lamothe's supervisor. Sheehan, who testified by deposition, explained that Finnegan's father was a former city solicitor. Hence, Sheehan gave the matter prompt and personal attention once the elder Finnegan came to him and complained. Following Sheehan's investigation of the incident, he suspended Lamothe for four days in the fall of 1983. The plaintiff argued that so mild a reaction to so odious a performance, especially when coupled with the fact that, a year later, Sheehan promoted Lamothe to the rank of lieutenant, amply evinced a municipal policy of indifference to police brutality.

The City offers a salmagundi of reasons to support its contention that the Finnegan testimony should have been excluded: (i) the evidence was irrelevant because nothing about the Finnegan incident helped to establish the existence of a municipal policy some six months earlier; (ii) even if relevant, the incident was so outrageous as to prejudice the jury unduly; (iii) the plaintiff should have been made to minimize the inflammatory effect of the testimony by offering in its stead a police report of the incident; and (iv) the testimony was improper because the incident itself was the subject of independent litigation and settle-

---

2. This evidence was admitted only against the City, and the district court properly instructed the jury to this effect.

ment. This asseverational array may sound plenteous, but it is Barmecidal.

## A. *Relevancy and Probative Value.*

■■■ We do not believe that the probative value of the testimony can seriously be disputed. For the plaintiff to have prevailed on his claim of municipal liability under 42 U.S.C. § 1983, he had to establish both that (1) there existed a municipal custom or policy of deliberate indifference to the commission of constitutional violations by police officers; and (2) this custom or policy was the cause of, and moving force behind, the particular constitutional deprivation of which he was complaining. *See Bordanaro v. McLeod,* 871 F.2d 1151, 1156 (1st Cir.) (collecting relevant Supreme Court cases), *cert. denied,* 493 U.S. 820, 110 S.Ct. 75, 107 L.Ed.2d 42 (1989). Contrary to the City's exhortation that the date an incident occurs marks the outside date for evidence-gathering on such an issue, we think that actions taken subsequent to an event are admissible if, and to the extent that, they provide reliable insight into the policy in force at the time of the incident. *See, e.g., Bordanaro,* 871 F.2d at 1167 ("Post-event evidence can shed some light on what policies existed in the city on the date of an alleged deprivation of constitutional right.").[3] We do not mean to imply that all post-event evidence is automatically admissible in a section 1983 "custom or policy" case. Rather, the question that must be asked when post-event evidence is proffered is whether the evidence sufficiently relates to the central occurrence. *See Sherrod v. Berry,* 827 F.2d 195, 204–05 (7th Cir.1987) (admission of evidence regarding separate suit brought against police officer upheld even though incident giving rise to separate suit occurred one month after the event upon which current litigation was based), *vacated on other grounds,* 835 F.2d 1222 (7th Cir.), *remand-* *ed for new trial,* 856 F.2d 802 (7th Cir. 1988) (en banc); *see also* Fed.R.Evid. 401 (evidence is relevant so long as it "ha[s] any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence"); *cf. United States v. Mena,* 933 F.2d 19, 25 n. 5 (1st Cir.1991) ("events that occur after an offense has been perpetrated may be relevant in an assessment of what transpired at the earlier time").

The district court's determination of relatedness in this context is reviewable only for abuse of discretion, gauged in light of the record as a whole. *See generally Veranda Beach Club Limited Partnership v. Western Surety Co.,* 936 F.2d 1364, 1373 (1st Cir.1991) ("In the federal system, a trial court has appreciable flexibility in admitting or excluding evidence on relevancy grounds."); *Lubanski v. Coleco Indus., Inc.,* 929 F.2d 42, 45 (1st Cir.1991) (similar). We discern no such abuse in the court's conclusion that the Finnegan incident bore upon the policy in effect six months prior. For one thing, the incident formed part of the basis for the opinion of Lou Reiter, the plaintiff's expert witness, about the municipal policy which existed around the time Foley was mauled.[4] For another thing, the Foley and Finnegan vignettes had noticeable similarities. Indeed, the lack of restraint the police officers exhibited on both occasions itself suggested the existence of an official policy of tolerating imbrutage. *See Carter v. District of Columbia,* 795 F.2d 116, 124 (D.C.Cir.1986) ("Egregious instances of misconduct, relatively few in number but following a common design, may support an inference that the instances would not occur but for municipal tolerance of the practice in question."); *Skibo v. City of New York,* 109 F.R.D. 58, 65 (E.D.N.Y.1985) ("Tolerance of unconstitutional conduct is tantamount to encouragement of such conduct and is therefore a

---

3. The defendant, essaying a narrow reading of *Bordanaro,* tells us that if such evidence is admissible at all, it must, as in *Bordanaro* itself, arise directly out of the principal event. We reject so crabbed a reading of the law.

4. Reiter based his opinion on a review of forty-one citizen complaints filed with the Department during the period 1978–1987, including Finnegan's complaint. The City stipulated below to Reiter's credentials. On appeal, the City does not challenge the admission of his testimony.

basis for municipal liability."). The incidents occurred in fairly close temporal proximity. There was no evidence of any policy revision or other change in course during the subsequent interval. On the facts of this case, it was well within the trial court's discretion to conclude that the Finnegan incident was competent, if indirect, evidence of a preexisting municipal policy of indifference.

### B. *The Rule 403 Calculus.*

█ Defendant's second point is that, even if the Finnegan incident had probative weight, it should have been excluded because of the prejudicial effect engendered by its outrageousness. This is unadulterated sophistry. Where, as here, a plaintiff attempts to establish the existence of a municipal policy of deliberate indifference through a concatenation of similar, but isolated, events, egregiousness is a hallmark of probative value: the more outrageous the occurrences, the more probable that a policy of tolerance was in place. We stated as much in *Bordanaro:*

> The absence of a strictly enforced disciplinary system led the officers ... to believe they were above the law and would not be sanctioned for their misconduct. *A sufficiently supervised, properly recruited, trained and disciplined group of officers would not have acted so far below the level of acceptable police behavior.*

871 F.2d at 1162–63 (footnote omitted and emphasis supplied); *see also Carter*, 795 F.2d at 124 (isolated, but repeated, instances of egregious conduct may support an inference of a policy of tolerance); *Grandstaff v. City of Borger*, 767 F.2d 161, 170 (5th Cir.1985) ("Where police officers know at the time they act that their use of deadly force in conscious disregard of the rights and safety of innocent third parties will meet with approval of city policymakers, the affirmative link/moving force requirement is satisfied."), *cert. denied*, 480 U.S. 916, 107 S.Ct. 1369, 94 L.Ed.2d 686 (1987);

*cf. Veranda Beach Club*, 936 F.2d at 1372 ("trials were never meant to be antiseptic affairs; it is only unfair prejudice, not prejudice per se, against which Rule 403 guards").

In any event, it is well established that a district court's assessment of probative weight and prejudicial effect under Fed. R.Evid. 403 is committed to the court's sound discretion.[5] *See United States v. Hadfield*, 918 F.2d 987, 994–95 (1st Cir. 1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 2062, 114 L.Ed.2d 466 (1991). Indeed, "the trial court's construction of the probative value/unfair prejudice balance, hammered out during the rough and tumble of the trial itself, is subject to substantial deference on appeal." *Veranda Beach Club*, 936 F.2d at 1372. It follows, then, that "[o]nly rarely—and in extraordinarily compelling circumstances—will we, from the vista of a cold appellate record, reverse a district court's on-the-spot judgment concerning the relative weighing of probative value and unfair effect." *Freeman v. Package Machinery Co.*, 865 F.2d 1331, 1340 (1st Cir.1988). No such circumstances exist here. In this case, admission of the evidence was an appropriate exercise of the trial court's discretion.

### C. *Alternative Methods of Proof.*

█ The City premises its next argument on *Carter*, a case where the plaintiffs, in support of their claim that top police officials knew nothing of complaints brought against the department, were permitted to read aloud newspaper articles, court pleadings, and administrative complaints containing allegations of misconduct. 795 F.2d at 126. The evidence was offered not to establish that the incidents actually happened, but to test certain officials' familiarity with the allegations. *Id.* The court of appeals ruled that this procedure was unfairly prejudicial, noting that the same purpose could have been accomplished by presenting brief factual summaries to the witnesses. Harping upon this precedent, the City suggests that the

---

**5.** The rule provides in pertinent part that, "[all]though relevant, evidence may be excluded if its probative value is substantially outweighed by

the danger of unfair prejudice...." Fed.R.Evid. 403.

court below erred by not insisting that the plaintiff substitute a police report of the incident for Finnegan's live testimony.

This suggestion is jejune. In the first place, it comes too late; the City never proposed such a substitution when the plaintiff made it known that he intended to put Finnegan on the witness stand. We take a dim view of a litigant neglecting to call alternative methods of proof to the trial court's attention and, later, arguing on appeal, for the first time, that the trial court should have mandated the alternate approach. *See generally Reilly v. United States*, 863 F.2d 149, 159 (1st Cir.1988) (appellant's claim that it was deprived of an opportunity to cross-examine a court-appointed advisor rejected on ground that appellant never requested such an opportunity below); *cf. In re Summit Corp.*, 891 F.2d 1, 6 n. 6 (1st Cir.1989) (corporation challenging order allowing bidder for corporation's stock to investigate corporation's affairs could not argue for the first time on appeal that the bidder should have obtained a subpoena).

In the second place, the suggestion rests on an invidious comparison. Here, no one presumed to read aloud second-hand accounts of an incident in the jury's presence, solely to show official awareness. Rather, the plaintiff offered first-hand, eyewitness testimony concerning a relevant, if lurid, episode in order to prove that the incident actually occurred and produced a tepid official response, not merely to show that supervisors were oblivious to a complaint. The City's reliance on *Carter* confuses apples with oranges.

### D. *Settlement of Finnegan's Claim.*

■ The City's final asseveration—that Finnegan's testimony should have been ex-cluded because the incident involving him was the subject of separate litigation, eventually settled—is sheer persiflage. There was no testimony offered or admitted concerning any such proceedings. Indeed, the district court told counsel that, although Finnegan's testimony would be allowed, evidence about the litigation and settlement of Finnegan's claim would be excluded. To the extent the City argues that Finnegan's settlement of his claim deprives all other prospective plaintiffs of the right to point to the underlying event as proof of a relevant municipal policy, its argument is both unprecedented and wrong. And to the extent that the City seeks to argue that proof of the settlement itself could not have been introduced, it is erecting a straw man with which we need not deal.

We have said enough. Evidence of the Finnegan incident strongly suggested that Lowell police officers did not feel constrained to hew their conduct within constitutional limits and, moreover, that the Department's hierarchy was not much concerned with the situation. The lower court's admission of the controverted evidence cannot support a charge of reversible error.

### III. THE PROPER PERIOD FOR PRE-JUDGMENT INTEREST

On June 6, 1989, the jury awarded the plaintiff $25,000 in compensatory damages for denial of his civil rights under federal and state law.[6] The district court entered judgment on the verdict on June 30, 1989. Thereafter, plaintiff filed a timely motion under Fed.R.Civ.P. 59(e) asking the court to amend the judgment to include prejudgment interest on plaintiff's state-law verdicts.[7] On July 31, 1989, the district court granted this motion, but did not enter a

---

**6.** The compensatory damage award ran jointly and severally against the City and Lamothe. In addition, the jury found against Lamothe for common law assault and battery, and awarded an additional $5,000 in punitive damages against him. This aspect of the award need not concern us, as Lamothe's appeal was never perfected. *See supra* note 1.

**7.** The applicable state statute provides:

In any action in which a verdict is rendered or a finding made or an order for judgment made for pecuniary damages for personal injuries to the plaintiff or for consequential damages, or for damage to property, there shall be added by the clerk of court to the amount of damages interest thereon at the rate of twelve per cent per annum from the date of commencement of the action....
Mass.Gen.L. ch. 231, § 6B.

final judgment. On November 29, 1989, in the course of a hearing on a variety of matters, the court reversed its field and denied plaintiff's motion to add prejudgment interest. For reasons which remain obscure, that order was not entered on the docket until January 26, 1990. Even then, it was not embodied in a judgment. In the meantime, the plaintiff moved for reconsideration of the reconsidered ruling. Eight months passed before the district court responded. On July 30, 1990, the court reinstated prejudgment interest. Once again no final judgment was entered.

At long last, the district court entered an amended final judgment on December 6, 1990. It provided that prejudgment interest would run on the compensatory damage award at the rate of 12% per annum from the date of suit (November 27, 1985) to the date the jury verdict was returned (June 6, 1989). Foley appeals, contending that the court improperly truncated the prejudgment interest period, thereby costing him the benefit, for an eighteen-month period, of the rate differential between prejudgment and postjudgment interest (12% per annum versus 8.16% per annum).

 Whether a prevailing plaintiff in a civil rights action is entitled to prejudgment interest is not always a straightforward question. In a suit for relief under section 1983 alone, in which a jury is demanded, it is the jury that must decide whether prejudgment interest is warranted. *See Cordero v. De Jesus-Mendez,* 922 F.2d 11, 13 (1st Cir.1990). Thus, if a plaintiff fails to request prejudgment interest from the jury in such a case, he is barred from subsequently seeking it from the judge. *Id.* It is equally well accepted, however, that in cases where parallel claims are brought under both federal and state laws, and the damages recovered are duplicative, i.e., not segregated into separate federal and state components, a prevailing plaintiff is entitled to select the body of law under which the damages will be paid. *See Doty v. Sewall,* 908 F.2d 1053, 1063 (1st Cir.1990); *see also Freeman,* 865 F.2d at 1345 ("In collecting the fruits of his victory, [plaintiff] was con-

cededly entitled to only a single slice of the pie—but the choice of the slice was his."). Hence, Foley, who prevailed on both his federal and state civil rights claims, was entitled to the undiminished fruits of his state-law victory. And under Mass.Gen.L. ch. 231, § 6B, those fruits included prejudgment interest, to be added ministerially *after* the verdict, not factored into the jury calculus.

Having established the plaintiff's right to collect prejudgment interest on the verdict against the City—an entitlement which the City now concedes—we turn to the architecture of the award. Neither party questions the startup date or the interest rate. The only issue before us, then, is whether the court selected the proper end date for the accrual of prejudgment interest.

 The prejudgment interest mandated by section 6B ordinarily applies "to that period from the date of commencement [of suit] to the date on which judgment is entered." *Charles D. Bonanno Linen Serv., Inc. v. McCarthy,* 550 F.Supp. 231, 248 (D.Mass.1982) (footnote omitted), *aff'd in relevant part,* 708 F.2d 1, 12 (1st Cir.), *cert. denied,* 464 U.S. 936, 104 S.Ct. 346, 78 L.Ed.2d 312 (1983); *see also Makino, U.S.A., Inc. v. Metlife Capital Credit Corp.,* 25 Mass.App.Ct. 302, 518 N.E.2d 519, 529 (1988). Accordingly, the plaintiff was presumptively entitled to prejudgment interest on the verdict against the City from the date of suit (November 27, 1985) until the date of final judgment below (December 6, 1990). *Cf. Kaiser Aluminum & Chem. Corp. v. Bonjorno,* 494 U.S. 827, 110 S.Ct. 1570, 1576, 108 L.Ed.2d 842 (1990) (postjudgment interest under 28 U.S.C. § 1961 properly runs from the date of the entry of judgment, not from the date of verdict). The court below did not honor this presumption. It appears to have selected June 6, 1989 (the date of verdict) as the end date in order to prevent plaintiff from reaping a perceived windfall. The court's use of the date of verdict for this purpose, although well intentioned, is insupportable.

 To be sure, a trial court has some discretion under Massachusetts prac-

tice to adjust an interest award if a prevailing litigant has been responsible for unnecessary delays. *See Currier v. Malden Redevelopment Auth.*, 16 Mass.App.Ct. 906, 449 N.E.2d 679, 681 (1983). But in this instance, the court below gave no indication that it was altering the usual timetable in order to rectify injustices brought about by unwarranted delay *attributable to the plaintiff.*[8] Indeed, the record unmistakably reveals that any delay involved in entering a final judgment was prompted by the defendants' posttrial motions as well as by the district court's backing and filing.[9] Furthermore, the defendant was at liberty at any time during the post-verdict period to petition the court to enter a final judgment; it chose not to file such a motion. On this record, then, the date of final judgment must serve as the end date in the prejudgment interest tabulation. Inasmuch as the lower court gave Foley less than his due in this respect, the judgment entered in his favor must be modified.[10]

## IV. ATTORNEYS' FEES

Subsequent to trial, the plaintiff, having prevailed, sought an award of counsel fees and costs under the Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988, and its state-law counterpart, Mass.Gen.L. ch. 12, § 11I. The plaintiff's principal fee application (the PFA) contained a fully itemized account, supported by affidavits and other documentation. The PFA requested fees of $164,133 for services rendered through July 31, 1989. The City filed a perfunctory objection. On November 17, 1989, the district court awarded the plaintiff $110,000. On August 30, 1990, after wrestling with the matter of prejudgment interest (*see supra* Part III), the City's request for a stay, and similar desiderata, the plaintiff filed a supplemental fee application (the SFA). The district court failed to act on it.

In briefing their respective appeals, both sides took exception to the rulings on fees. The parties agreed that the district court was derelict in not making specific findings. The plaintiff, moreover, complained that the court had totally ignored the SFA. Following oral argument in this court, we retained jurisdiction over the appeals, but directed the court below to explain the PFA award and resolve the SFA. The court complied. With respect to the PFA, the district judge found that the rates claimed by plaintiff's counsel (ranging from $90 to $180 per hour, and varying according to the nature of the work performed), including law clerk and paralegal rates ($40–$60 per hour), were fair and reasonable, but that the total time claimed (1587½ hours) was disproportionate both to the relative simplicity of the case and to the amount of damages recovered. Thus, the court reduced the total number of hours by approximately one-third and applied the plaintiff's rate schedule to the balance, arriving at a fee of $110,000. With respect to the SFA, the court adopted the same rationale, shrinking the total hours claimed (26.3) by one-third and setting the incremental fee at $2371. After receiving the district court's written statement, we entertained supplementary briefing.

■■■ We review fee awards for abuse of discretion. *See United States v. Metropol-*

---

8. At any rate, the City did not argue below that the end date for the prejudgment interest calculation should be altered to offset delays caused by plaintiff, nor does it argue on appeal that the plaintiff was responsible for any such procrastination. Thus, the point is, at best, of purely academic interest. *See, e.g., Sandstrom v. Chemlawn Corp.*, 904 F.2d 83, 87 (1st Cir.1990) (issues not raised below are waived); *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir.) (issues not briefed or argued on appeal are deemed abandoned), *cert. denied*, 494 U.S. 1082, 110 S.Ct. 1814, 108 L.Ed.2d 944 (1990).

9. To cite but one example, the district court was directed by this court on October 25, 1989 "to enter a new final judgment embodying the amount of damages plus prejudgment interest awarded." Notwithstanding this express direction, the district court did not enter such a judgment until more than thirteen additional months had elapsed.

10. Because the plaintiff is entitled to prejudgment interest on the damage award from November 27, 1985 until final judgment was entered on December 6, 1990, postjudgment interest on damages (originally specified by the district court to start on June 6, 1989) must be deferred to dovetail with the end of the prejudgment interest period.

*itan Dist. Comm'n,* 847 F.2d 12, 14 (1st Cir.1988); *Wojtkowski v. Cade,* 725 F.2d 127, 130 (1st Cir.1984). Here, both sides perceive abuse: the plaintiff says the fees are niggardly and the defendant says they are overly munificent. We briefly address the parties' cardinal contentions.[11]

### A. *The Plaintiff's Claims.*

The plaintiff's flagship argument is that, because the City mounted no meaningful opposition to the fee applications, the PFA and the SFA should have been granted according to their tenor. We have, however, previously considered and rejected such an approach. Setting attorneys' fees is a delicate business; what the court orders in one case can, and often does, affect the outcome of fee applications in other cases. Indeed, "[t]he continued viability of and confidence in the public funding of certain litigation are dependent on the perception that claims [for counsel fees] are subject not only to testing by adversaries but to the independent review of a court." *Gabriele v. Southworth,* 712 F.2d 1505, 1507 (1st Cir.1983). At least where public funds are involved or the public interest is otherwise implicated, the court has a duty to consider the application critically to ensure overall fairness—a duty that abides even when a fee target is slipshod in its opposition to a fee application. *See Metropolitan Dist. Comm'n,* 847 F.2d at 17; *Wojtkowski,* 725 F.2d at 130; *cf. Foster v. Mydas Assoc., Inc.,* 943 F.2d 139, 143 (1st Cir.1991) (court need not accept counsel's compilation of time and charges at face value); *Weinberger v. Great Northern Nekoosa Corp.,* 925 F.2d 518, 529 (1st Cir.1991) (same). Here, the district court had a right to peruse the fee applications with an experienced eye, notwithstanding the lack of specific assistance offered by the City.

The plaintiff's next complaint relates to the court's decision to discount the number of hours logged. The court cited

two reasons for the reduction: lack of complexity and lack of proportionality. The reasons are acceptable as a matter of law and supportable as a matter of fact.

To be sure, labelling this case as noncomplex is, as the plaintiff argues, debatable. Complexity is, at best, a relative term, the parameters of which may lie to some extent in the mind of the beholder. On the other hand, the total time invested by the plaintiff's counsel was somewhat more extensive than one might ordinarily expect a comparable police brutality case to demand. We have warned litigants in the past that, where counsel fee awards are concerned, "[t]o a far greater extent than is true of discrete legal issues, the battle is likely to be determined in the trial court." *Rogers v. Okin,* 821 F.2d 22, 30 (1st Cir.1987), *cert. denied,* 484 U.S. 1010, 108 S.Ct. 709, 98 L.Ed.2d 660 (1988). That prediction has obvious pertinence here. The abuse-of-discretion standard requires us to defer in large measure to the district court in constructing a balance between the time expended on a case and the case's complexity. After all, an appellate tribunal lacks the means to replicate the trial court's firsthand knowledge of the litigation and its nuances. Thus, when the balance struck by the trial court falls within the broad realm of reasonableness, there is no cause to place an appellate thumb on the decisional scales.

The district court was equally entitled to take into account the relative size of the damage award and fee request. While the amount of damages recovered in a civil rights suit does not constitute a dispositive criterion, or even a ceiling on an ensuing fee award, it is nonetheless relevant to the calculation of a reasonable fee. *See City of Riverside v. Rivera,* 477 U.S. 561, 574, 106 S.Ct. 2686, 2694, 91 L.Ed.2d 466 (1986) (plurality op.); *Hensley v. Eckerhart,* 461 U.S. 424, 436, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983). Often, when the amount sought is large but the actual recovery is small, fees may be reduced some-

11. On appeal, neither party has complained about the awarding, initially, of costs in the amount of $12,103.28; or about the awarding, subsequently, of an additional $546.17 in costs. Hence, we deal only with fees, omitting further reference to costs.

what.[12] *See Lewis v. Kendrick,* 944 F.2d 949 (1st Cir.1991); *Zabkowicz v. West Bend Co.,* 789 F.2d 540, 552–53 (7th Cir.1986). We recognize that in some cases, as here, a reasonable fee may exceed, several times over, the amount recovered by the plaintiff as damages—but that verity neither means, nor suggests, that the trial court must close its eyes to the amount of the recovery.

■ The plaintiff has a fallback position. He argues that, even if the court was entitled to discount the fee request because of the factors cited, the court's reduction of logged time slashed too deeply, cutting not only fat, but sinew. A district court is expected to explicate the basis for its fee awards. *Foster,* 943 F.2d at 141; *Langton v. Johnston,* 928 F.2d 1206, 1226 (1st Cir. 1991); *Grendel's Den, Inc. v. Larkin,* 749 F.2d 945, 950 (1st Cir.1984). Under this approach, reductions in diary-supported bills must be satisfactorily explained. *See Jacobs v. Mancuso,* 825 F.2d 559, 562 (1st Cir.1987). Although findings are necessary, however, they need not be "infinitely precise," *Metropolitan Dist. Comm'n,* 847 F.2d at 16 n. 4, "deluged with details," *Gabriele,* 712 F.2d at 1507, or even "full[y] articulat[ed]," *Jacobs,* 825 F.2d at 564. We, ourselves, have felt free to abjure both "a comprehensive accounting" and "line-by-line review" of a prevailing plaintiff's counsel fee application, *Ackerley Communications v. City of Somerville,* 901 F.2d 170, 171 & n. 4 (1st Cir.1990) (order on petition for counsel fees), and we will not hold the court below to a more rigorous standard.

■ Applying these precepts, we think that the court's explanation of the reduction, while more general than one might hope, was marginally adequate, and that the across-the-board reduction itself passed muster. Accepting the hourly rates at face value, the court could rightfully adjust the hours to reflect that expert counsel, worthy of such rates, might need less time. *See Ackerley Communications,* 901 F.2d at 172–73. More important still, the net result of the court's paring "seem[s] plausible, given what has transpired in the litigation." *Metropolitan Dist. Comm'n,* 847 F.2d at 18. Mindful of the latitude that the trial judge's immersion in the case demands, we cannot say that a one-third reduction in the PFA went beyond the pale.[13] *See, e.g., id.* at 16 (in setting attorneys' fees, district court may "concentrat[e] on what was necessary to be accomplished rather than on a welter of time sheets"); *Hart v. Bourque,* 798 F.2d 519, 523 (1st Cir.1986) ("the real test cannot be the number of hours logged, but what was done"); *Gabriele,* 712 F.2d at 1507 (in fixing a reasonable fee, the court must "retain a sense of overall proportion").

### B. *The Defendant's Claim.*

We need not linger long over the City's protests. While we recognize that a district court has a duty of independent inquiry in respect to fee applications, *see supra* pp. 18–19 and cases cited, that duty is designed to ensure that a fee award, overall, is justified, and that the amount of the award comes within the realm of reasonableness, broadly defined. In other words, "it falls to the court to act as the guarantor of fairness." *Metropolitan Dist. Comm'n,* 847 F.2d at 17.

■ The district court's role, however, does not divest a party opposing a fee

---

**12.** In this case, Foley sought $1,000,000 in compensatory damages against the City, but recovered only $25,000. He also sought $1,000,000 in exemplary damages against the City, recovering nothing (although the jury did award him $5,000 in punitives against Lamothe).

**13.** We do, however, part company with the lower court in connection with the SFA. While the court's stated reasons have some persuasive force in terms of the main body of litigation, those reasons are completely irrelevant to the work encompassed by the SFA. Neither the

routine nature of the trial issues nor the amount of the verdict were factors that should have influenced the district court's assessment of a supplementary fee application related to an entirely different aspect of the case, occurring after the jury trial ended. On this record, given the court's approval of the plaintiff's rate schedule and its acceptance of the time logged, we believe that the SFA should have been honored in full. The SFA award must be modified to this extent.

award of its responsibility to protect its interests. When, as here, a fee target has failed to offer either countervailing evidence or persuasive argumentation in support of its position, we do not think it is the court's job either to do the target's homework or to take heroic measures aimed at salvaging the target from the predictable consequences of self-indulgent lassitude. As we have written before, "[c]ourts, like the Deity, are most frequently moved to help those who help themselves." *Paterson–Leitch Co. v. Massachusetts Municipal Wholesale Elec. Co.*, 840 F.2d 985, 989 (1st Cir.1988). This is as it should be.

Applying this principle here, the defendant's claim of extravagance strikes us as entirely insupportable. To be sure, the rates that the district court employed were high—but not so pricey as to be unreasonable. *See Ackerley Communications*, 901 F.2d at 172–73. The City, of course, had an opportunity to adduce evidence of a more realistic rate structure, but did not do so. Absent any such evidence, we are hard pressed to fault the lower court for embracing the plaintiff's suggested rates. By the same token, the City did not give the trial court (or this court, for that matter) a roadmap showing how the hours allowed were excessive or unwarranted.

Saying more would serve no useful purpose. The counsel fees awarded were not unreasonable on their face. Given the depth of the cuts made below and the absence of any particularized showing as to why or how the time allotment should have been scarified even more markedly, we cannot regard the award as being so exorbitant that it constituted an abuse of the trial court's discretion.

## V. POSTJUDGMENT INTEREST—ATTORNEYS' FEES

■ The plaintiff's last contention is that the district court erred when, in entering final judgment, the court made provision for payment of postjudgment interest

on the jury verdict, but not on the fees awarded under the PFA. We agree.

Although the basic question raised by Foley is one of novel impression in this circuit, there is no shortage of decided cases elsewhere. Insofar as we can determine, virtually every circuit to confront the question has concluded that, if an attorneys' fee award is incorporated in a final judgment, as here, interest will thereafter accrue on the amount of the award. *See, e.g., Transpower Constructors v. Grand River Dam Auth.*, 905 F.2d 1413, 1423–24 (10th Cir.1990); *Fleming v. County of Kane*, 898 F.2d 553, 564–65 (7th Cir.1990); *Georgia Ass'n of Retarded Citizens v. McDaniel*, 855 F.2d 794, 795–99 (11th Cir. 1988); *Institutionalized Juveniles v. Secretary of Pub. Welfare*, 758 F.2d 897, 927 (3d Cir.1985); *R.W.T. v. Dalton*, 712 F.2d 1225, 1234–35 (8th Cir.), *cert. denied*, 464 U.S. 1009, 104 S.Ct. 527, 78 L.Ed.2d 710 (1983); *Copper Liquor, Inc. v. Adolph Coors Co.*, 701 F.2d 542, 543–45 (5th Cir. 1983) (en banc) (per curiam); *City of Detroit v. Grinnell Corp.*, 575 F.2d 1009, 1010 (2d Cir.1977); *Perkins v. Standard Oil Co.*, 487 F.2d 672, 675 (9th Cir.1973). Most frequently, our sister circuits have reached this result by invoking 28 U.S.C. § 1961 (1988),[14] reasoning that no real distinction exists between judgments for attorneys' fees and other monetary judgments. *See, e.g., R.W.T.*, 712 F.2d at 1234; *Copper Liquor*, 701 F.2d at 544; *Perkins*, 487 F.2d at 675; *accord Mill Pond Assocs., Inc. v. E & B Giftware, Inc.*, 751 F.Supp. 299, 303 (D.Mass.1990).

We find the *ratio decidendi* of these cases convincing. For one thing, short of straining, the plain language of section 1961(a) does not appear to permit a contrary result. For another thing, fee awards, once made, bear a very real resemblance to most kinds of compensatory damages. Thirdly, if a court purposes to enter final judgment, the expectation should be that *all* monies awarded therein—not merely those monies labelled "damages"—will

**14.** The statute provides in pertinent part that: "Interest shall be allowed on any money judgment in a civil case recovered in a district court." 28 U.S.C. § 1961(a). The rate is floating rather than fixed, being tied to coupon yield on treasury bills. *See id.* The parties agree that, if section 1961 applies, the appropriate interest rate for purposes of this case is 8.16%.

be paid in the ordinary course; considering the time value of the dollar, the only way in which a fee award will retain its stated worth is by adding interest in order to compensate for delay in payment from that point forward. For these reasons, we hold that, once a money judgment is obtained in a federal district court, interest thereon is obligatory under 28 U.S.C. § 1961 without regard to the elements of which that judgment is composed, even if attorneys' fees are included.[15] *See United States v. Michael Schiavone & Sons, Inc.*, 450 F.2d 875, 876 (1st Cir.1971) (deciding that postjudgment interest accrues under 28 U.S.C. § 1961 on a civil penalty incorporated in a final judgment).

■ We hold, further, that when a final judgment is entered which includes a sum of money for attorneys' fees, interest will accrue on the attorneys' fee portion of the judgment, under the postjudgment interest statute, 28 U.S.C. § 1961, from the date the judgment is entered, but not from a date prior to entry of judgment.[16] In our view,

the statute's plain language admits of no other result. *See Kaiser Aluminum*, 110 S.Ct. at 1575–76 (appropriate date for calculation of postjudgment interest on award of damages is date of judgment, not date of verdict); *Marshall v. Perez–Arzuaga*, 866 F.2d 521, 522 (1st Cir.1989) (under federal law, postjudgment interest accrues "from the entry date of a district court's final judgment") (citing other First Circuit cases); *see also* 28 U.S.C. § 1961(a) (postjudgment interest "shall be calculated from the entry of the judgment").[17]

## VI. CONCLUSION

We need go no further. Finding, as we do, that the trial court's evidentiary rulings were unassailable, the jury verdict must stand. The judgment must be modified, however, to reflect a proper prejudgment interest period referable to compensatory damages. Lastly, we affirm the district court's award of counsel fees and costs,

**15.** Our earlier case of *Cordero v. De Jesus–Mendez*, 867 F.2d 1 (1st Cir.1989), *appeal after remand*, 922 F.2d 11 (1st Cir.1990), is not to the contrary. In *Cordero*, an award of attorneys' fees was made on October 24, 1986, and vacated on appeal. 867 F.2d at 22. The district court was instructed to consider the issue of attorneys' fees *de novo. Id.* The court failed to do so, merely supplementing the original award instead of recalculating fees. 922 F.2d at 19. We again vacated the award and remanded for reconsideration, rejecting *inter alia* the plaintiffs' contention that the fees awarded in 1986 should accrue interest under 28 U.S.C. § 1961. *Id.* Saying, as in *Cordero*, that postjudgment interest will not accrue in respect to a vacated judgment says little or nothing about whether postjudgment interest will accrue on an affirmed judgment.

**16.** We do not undertake to decide here whether postjudgment interest begins to accrue from the date a judgment expressly and unconditionally establishing a party's right to attorneys' fees is entered or from the date of a judgment that establishes the quantum of such fees (in a case where those dates differ). *See Jenkins v. Missouri*, 931 F.2d 1273, 1275–77 (8th Cir.1991) (discussing problem and division of authority), *petition for cert. filed* (U.S. Aug. 28, 1991) (No. 91–360). In this case, the original judgment, entered on June 30, 1989, did not mention attorneys' fees.

**17.** On appeal, Foley theorizes that, notwithstanding the statute's circumscribed reach, in-

terest should accrue in this instance from the date the principal fee award was made (November 17, 1989) because (i) the district court was wrong in not entering a final judgment incorporating attorneys' fees at an earlier date and (ii) general equitable principles so suggest, *see, e.g., Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Knudsen*, 749 F.2d 496, 497–98 (8th Cir.1984). But this theory runs up against an insurmountable obstacle. Despite ample opportunity to do so, Foley never asked the district court either to enter the attorneys' fee award as a final judgment at an earlier date or to grant interest on it for the period between the date of the award and the date when final judgment was entered. That ends the matter. "[I]t is black letter law that it is a party's first obligation to seek any relief that might fairly have been thought available in the district court before seeking it on appeal." *Beaulieu v. United States Internal Revenue Service*, 865 F.2d 1351, 1352 (1st Cir.1989). *See also Sandstrom v. Chemlawn Corp.*, 904 F.2d 83, 87 (1st Cir.1990) (issues not raised below are waived); *Dartmouth Review v. Dartmouth College*, 889 F.2d 13, 22 n. 9 (1st Cir. 1989) (parties who elect not to seek particular relief below "must clearly understand that they will have an uphill fight in this circuit to convince the court of appeals to consider a request for the relief as a matter of first impression"). Accordingly, we decline to entertain Foley's belated request for an added period of interest anent the PFA.

with the modifications described in Parts IV and V of this opinion.

Because the plaintiff has prevailed on appeal in respect to most (but not all) of the issues, he is entitled to reasonable counsel fees and costs incurred during the pendency of these appeals under both 42 U.S.C. § 1988 and its state-law counterpart, Mass.Gen.L. ch. 12, § 11I; the award to be discounted, of course, with respect to any excessive time or time spent on issues as to which the plaintiff lost. In the past we have handled the matter of fees on appeal in three different ways. Sometimes, we have remanded to the trial court to determine a reasonable fee. *See, e.g., Rodi v. Ventetuolo,* 941 F.2d 22, 31 (1st Cir.1991). Sometimes, we have fixed the fees ourselves, without asking counsel for any assistance. *See, e.g., Jacobs,* 825 F.2d at 564. Sometimes, we have taken a middle course, soliciting counsel's input and then setting the fee without recourse to the district court. *See, e.g., Fidelity Guarantee Mortgage Corp. v. Reben,* 809 F.2d 931, 938 (1st Cir.1987). In this case, we think the middle course would be best. We therefore direct the plaintiff to file his application for counsel fees and costs on appeal with the clerk of this court within thirty days of the date hereof pursuant to 1st Cir.Loc.R. 39.2. The City shall file its response to the application as therein provided. We shall thereafter enter an appropriate order.

*The judgment below is affirmed with the modifications described herein. We retain jurisdiction pending the determination of fees on appeal.*