**Robert A. MARTIN, Plaintiff,**

v.

**ENVELOPE DIVISION OF WESTVACO CORPORATION and Westvaco Corporation, Defendants.**

**Civ. A. No. 92–30121–MAP.**

United States District Court,
D. Massachusetts.

April 29, 1994.

John C. Sikorski, Robinson, Donovan, Madden & Barry, Springfield, MA, for plaintiff.

Jay M. Presser, Toby G. Hartt, Skoler, Abbott & Presser, Springfield, MA, for defendants.

## MEMORANDUM REGARDING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [1]

(Docket No. 26)

PONSOR, District Judge

### I. *INTRODUCTION.*

Plaintiff Robert Martin charges his former employer, defendant Envelope Division of Westvaco Corporation and its parent, defendant Westvaco Corporation (collectively referred to as "Westvaco") with age discrimination in violation of 29 U.S.C. §§ 621 *et seq.* ("ADEA") and Mass.Gen.Laws ch. 151B. In addition he asserts a claim of handicap discrimination, also in violation of ch. 151B. Finally, Martin charges that his employer's decision to terminate him violated the Massachusetts Equal Rights Act, Mass.Gen.Laws ch. 93, § 103.

Before this court is defendants' motion for summary judgment on these four counts of the complaint[2]. The record contains sufficient evidence raising disputed issues of material fact that would permit a factfinder to conclude that age animus infected the decision to terminate Martin. Plaintiff's theory of discrimination is tenuous but requires a jury to resolve the factual disputes and choose between permissible alternative inferences that may be drawn from undisputed portions of the record.

However, there is no evidence from which a reasonable factfinder could conclude that plaintiff's alleged handicap, a heart condition, was in any way involved in the decision to terminate him. And, as a matter of law, ch. 151B remains the exclusive state law remedy for claims of employment discrimination. For these reasons, this court will allow summary judgment as to plaintiff's handicap and MERA claims.

### II. *SUMMARY JUDGMENT.*

■ Summary judgment is properly granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Goldman v. First Nat'l. Bank,* 985 F.2d 1113, 1116 (1st Cir. 1993). First, the moving party must aver an absence of evidence to support the nonmoving party's case. *Garside v. Osco Drug, Inc.,* 895 F.2d 46, 48 (1st Cir.1990). In order to fend off summary judgment, a plaintiff must "establish at least a genuine issue of material fact on every element essential to his case in chief." *Vega v. Kodak Caribbean, Ltd.,* 3 F.3d 476, 479 (1st Cir.1993), quoting *Mesnick v. General Electric Co.,* 950 F.2d 816, 820 (1st Cir.1991), *cert. denied,* — U.S. ——, 112 S.Ct. 2965, 119 L.Ed.2d 586 (1992).

■ A "genuine issue" exists if there is "sufficient evidence supporting the claimed factual dispute to require a choice between the parties' differing versions of the truth at trial." *Garside v. Osco Drug, Inc.* 895 F.2d at 48 (quotes and citations omitted). The nonmovant must present substantial evidence that supports differing versions of the truth requiring resolution by a factfinder; unsupported conjecture will not suffice. *Mack v. Great Atlantic & Pacific Tea Co.,* 871 F.2d 179, 181 (1st Cir.1989). "Even in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests

---

1. This matter originally came before me as a magistrate judge for report and recommendation to the district court. It has now been transferred to me for all purposes. This memo therefore constitutes the district court's ruling on defendants' motion.

2. A prior dispositive motion eliminated Count IV and V alleging intentional infliction of emotional distress and loss of consortium.

merely upon conclusory allegations, improbable inference and unsupported speculation." *Medina–Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir.1990).

At summary judgment it is this court's obligation "to review the record in the light most favorable to the nonmoving party, and draw all reasonable inferences in the nonmoving party's favor." *LeBlanc v. Great American Insurance Co.*, 6 F.3d 836, 841 (1st Cir.1993), citing *Mesnick v. General Electric Co.*, 950 F.2d at 820.

### III.  *FACTUAL BACKGROUND.*

The plaintiff's claim arises out of the following, largely undisputed, facts.

Robert Martin was employed for twenty-four years in the Engineering Department of defendant Westvaco Corporation's ("Westvaco") Envelope Division in Springfield, Massachusetts.  On March 1, 1991, as part of a major reduction in force ("RIF"), Martin and 49 other salaried employees in the Envelope Division were terminated.  The reduction in force had a disproportionate impact on the Engineering Department, which designed and built proprietary envelope-making machinery for all eight of Westvaco's envelope manufacturing plants in the United States. Martin worked in the Engineering Department during his tenure at Westvaco and for most of that time served as Coordinator of the department's Machine Parts Control unit ("MPC").  The MPC unit procured, inspected and inventoried machine parts used to construct and maintain the envelope-making machinery.

The impetus for the March, 1991 force reduction was a strong directive to the Envelope Division from Westvaco's President, John Luke, mandating that it improve its profitability and make organizational adjustments to reflect impending market changes. Jack Leahy, Westvaco Manager of Personnel and Industrial Relations, stated in his affidavit that this was the first significant RIF in the Envelope Division in fifteen years.

The Leahy affidavit also noted that prior to this RIF, Westvaco had no policy providing a procedure for implementing lay-offs of salaried personnel.  Accordingly, Leahy prepared two memos to guide management through the force reduction.  First, on November 19, 1990, Leahy wrote a confidential memorandum to Rudolph Johnstone, newly appointed Manager of the Envelope Division, discussing the problems and challenges posed by corporate downsizing.  Leahy warned that, without careful planning, corporate streamlining could target the wrong areas and legal expenses could eat up any savings.  In this regard, Leahy's memo discussed at some length the federal Age Discrimination in Employment Act (ADEA). He wrote that a "careless comment by a supervisor, a history of good performance appraisals, a reduction in the average age of the workforce are examples of the kinds of evidence that can carry cases to a jury." Plaintiff Attorney's Affidavit Exhibit 9.  The rest of the memo weighed the relative merits of different approaches to work force reduction:  early retirement incentives, voluntary resignation incentives, attrition, and termination/layoff.  Ultimately, after some consideration, Westvaco rejected early retirement incentives or attrition to reduce the number of salaried employees.  A decision was made to reduce salaried personnel by involuntary layoffs.  Westvaco management determined this to be the approach that minimized the loss of necessary job skills and maximized cost savings.

In a second memo, dated January 24, 1991, Leahy addressed the procedures that managers were to use to ensure that the layoffs would be fair to all employees and at the same time consistent with each department's business needs.  According to the defendant, managers were instructed to evaluate the future viability of each functional job *position* without consideration of the performance of the individual employee then holding that job.  Individual performance was *only* to be considered if, within a particular job category, some employees were to be laid off, while others were to be retained.  Otherwise, if an employee's position was being eliminated, his or her performance was not to be evaluated or considered.  In order to maintain efficiency and minimize job retraining, senior employees whose positions were terminated were not permitted to "bump" lower seniority employees.

Consistent with this approach, Johnstone instructed his managerial staff to eliminate and restructure job positions in their departments so as to eliminate work not essential to the Division's core business of manufacturing envelopes. In November, 1990, Johnstone met with Gregory Georgiades, Manager of the Engineering Department to discuss personnel reductions in his department. At deposition, Johnstone stated that he explained to Georgiades that Westvaco was going to stop fabricating envelope making machinery. In the future, this work would be performed by outside vendors. In addition, Johnstone explained that Engineering's purchasing and inventory control of spare parts was to be decentralized and farmed out to vendors and individual Westvaco manufacturing facilities.

At deposition, Georgiades averred that his framework for reducing the staffing of his department was to preserve, as much as possible, engineering expertise and knowledge by eliminating the positions of employees not directly engaged in engineering or design work. Johnstone did not calculate a specific numerical goal—either in terms of gross savings to be achieved or number of employees to be laid off—to guide Georgiades in implementing this directive. Johnstone's approach proved effective and by January 16 he informed his superiors that 27 salaried positions were being eliminated from Engineering.

As it turned out, Georgiades was reluctant to reduce the staffing of the Engineering Department radically and proposed to Johnstone five successive proposals, each cutting more positions than its predecessor. Johnstone found each proposed staff reduction insufficient and repeatedly directed Georgiades to further streamline his organization to accommodate Johnstone's unstated[3] staff and cost reduction goals. Only the fifth proposal, presented by Georgiades sometime in February, satisfied Johnstone. Of the fifty positions then existing in Engineering twenty-eight were to be eliminated, a fifty-six per cent reduction in the Engineering Department staff.

Following these cuts, the number of Engineering Department personnel directly engaged in engineering and design work declined from twenty-one to eleven: five engineers, four machine designers, and two engineering associates were eliminated. A technical secretary position was also done away with. The electrical engineering unit was reduced from three persons to one. Engineering Services—which included the machine shop, equipment training personnel and Machine Parts Control ("MPC")—was the hardest hit. After the reduction in force, the machine shop, formerly comprised of a supervisor and eight technicians (machinists), contained a supervisor, one machinist and an electrical engineer. Prior to the RIF, equipment training was carried out by six employees. This unit was eliminated altogether. Only customer service, comprised of two employees, remained intact.

It is undisputed that by January 8—when Georgiades made his second round staff cutting proposal to Johnstone—Martin was already slated for termination. At deposition, Stephen Degenhardt, Manufacturing Manager, stated that, by January 8, Georgiades had already recommended Martin's severance. This fact was also apparent from the organizational charts and records Georgiades constructed in the course of planning his department's restructuring. One such chart, dated January 8, 1991, illustrated a department comprised of twenty-seven persons with small, but still existing, MPC and machine shop units. In this chart, the MPC unit was comprised of four persons, of whom only one, A.B. Carta, age 25, previously worked in the MPC unit. The other three employees were a former design engineer, S.F. Cook, age 48, a former customer service representative, D. Purcell, age 29 and a former machinist, D. Foisy, age 35. The plaintiff, age 54, MPC supervisor A. Sattler, age 57, and crib attendants G. Nay, age 55, and D. Cecchetelli, age 22, were all slated for termination.

Georgiades' second chart, dated January 28, 1991 further reduced the department's workforce to twenty-two persons, but the

3. The record indicates that by sometime in January, Johnstone did inform senior management that his staff-reduction goal for Engineering was somewhere around fifty percent of existing staffing levels. This goal was never communicated to Georgiades.

MPC unit and Machine Shop were still included in the organizational structure. At this point, Cook, Carta and Purcell were named as the MPC unit. In both charts, the Machine Shop had the same three employees in place. Georgiades explained that the January 28 chart reflected the composition of the department following the fifth and final round of job eliminations.

Finally, Georgiades presented Leahy with a new Organizational Chart dated March 4, 1991—almost two weeks after the March 1 layoff was finalized and announced—that pared the department down to twenty persons and dispensed with the MPC unit entirely. In this configuration, only the 25 year old clerk, Amy Carta, was formally assigned MPC tasks. Carta's affidavit states that the tasks she was assigned to perform after the layoff were previously performed by Martin. Affidavit of Amy Carta, Ex. A of Plaintiff's Sur-reply Memorandum.

Following the March 1 lay-off, other Engineering Department personnel also performed the tasks of the former MPC unit. Douglas Purcell was listed on the final organizational chart as part of the Customer Service Engineering unit. Yet, in his deposition testimony he averred that after the March 1 layoff his duties changed. After that date he spent forty per cent of his time on other duties, which included purchasing, shipping and receiving of machine parts—all tasks previously performed by MPC. Purcell also stated that five other Engineering Department employees had been involved in purchasing and shipping/receiving of parts since the March layoff. However, no Engineering Department employee committed the majority of his or her time to these tasks. There are conflicting facts as to exactly how many hours each of these employees committed to former MPC unit functions.

Despite Johnstone's pre-RIF projection that, after the force reduction, machine building work would be performed by vendors, the record indicates that the Engineering Department continued to manufacture equipment for Envelope Division facilities. At deposition, Stephen Degenhardt, Manufacturing Manager, indicated that in the summer of 1991, major manufacturing equipment

was being constructed or modified by the Engineering Department. As of January 23, 1993, Degenhardt further stated that construction was planned for a battery of six to eight major proprietary envelope making machines. In addition an undated handwritten document submitted by Johnstone, titled "Other Profit Improvement Opportunities", discussed a number of new cost-saving projects to further automate envelope manufacturing. In his affidavit, plaintiff alleged that these projects would generate a significant amount of work for the MPC unit—specifically the kind of work performed by plaintiff prior to his termination.

Because, in the final analysis, the MPC unit was completely eliminated—at least on the organizational chart—Martin and other MPC unit personnel were not included in Georgiades' performance evaluations and comparative ranking. However, the record indicates that Martin was a mainstay of the MPC unit. Performance appraisals noted his strong knowledge and skills in accounting, purchasing and computerized inventory systems. In the late 1970's, Martin computerized the inventory system used to keep track of spare parts. He maintained good relations with outside vendors who produced machine parts and, as his supervisors noted, had an excellent record in meeting the emergency demands for spare parts from Westvaco's manufacturing facilities.

The record also indicates that Westvaco management credited Martin as a team player with good human relations skills. Written remarks by his supervisors indicated that he was flexible and adaptive when it came to promoting collaboration between vendors and manufacturing plant personnel. Martin trained most of the employees in MPC including his supervisor, Al Sattler. Martin held a B.S. degree and possessed considerable mechanical skills that he employed in his work with engineers, designers and fabricators.

The plaintiff suffered from a heart condition and missed considerable work time as a result. Medication was prescribed for this condition and, at the time of his termination, Martin was a serious candidate for heart bypass surgery. Martin's superiors knew of his

heart ailment. Plaintiff also alleges that five other Engineering Department employees suffered from "serious health conditions" and two spouses of two other employees suffered from debilitating ailments (Alzheimer's disease and an unnamed ailment causing the spouse to be wheelchair bound). Seven of these eight employees were terminated in the February RIF. The eighth employee retired. The defendant does not dispute these facts. Except for the termination, Martin expressly states that he was in no way adversely treated as a result of his heart condition. On February 19, 1991, the day the terminations were made known, Martin informed supervisory personnel of his decision to file age and handicap discrimination claims with the Massachusetts Commission Against Discrimination.

## IV. DISCUSSION.

### A. Age Discrimination: The ADEA Claim

#### 1. The Legal Framework

In an ADEA discrimination lawsuit, the plaintiff bears the ultimate "burden of proving that his years were the determinative factor in his discharge, that is, that he would not have been fired but for his age." *LeBlanc v. Great American Ins. Co.*, 6 F.3d 836, 842 (1st Cir.1993) (quoting *Mesnick v. General Elec. Co.*, 950 F.2d 816, 820 (1st Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 2965, 119 L.Ed.2d 586 (1992) (further quotes and citations omitted)). In this case, the plaintiff presents no direct evidence of discrimination. Consequently, the evidentiary presentation must follow the burden shifting paradigm in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See, also, LeBlanc v. Great American Ins. Co.*, 6 F.3d at 842; *Goldman v. First Nat'l. Bank of Boston*, 985 F.2d 1113 (1st Cir.1992).

■ First, the plaintiff must establish a *prima facie* case, creating a presumption that the employer engaged in impermissible age discrimination. *See e.g., Texas Dep't. of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *LeBlanc v. Great American Ins. Co.* 6 F.3d at 842. Next, the employer must rebut this

presumption by articulating a legitimate nondiscriminatory reason for the employee's termination. *LeBlanc*, 6 F.3d at 842. The employer's obligation is simply one of production. *Id.* The burden of persuasion remains [the employee's] at all times. *Mesnick v. General Elec. Co.*, 950 F.2d at 823.

Once the employer has proffered a legitimate, nondiscriminatory reason for the adverse employment decision "the McDonnell Douglas framework—with its presumptions and burdens—is no longer relevant." *St. Mary's Honor Ctr. v. Hicks*, —— U.S. ——, ——, 113 S.Ct. 2742, 2748–49, 125 L.Ed.2d 407 (1993). "The trier of fact must then simply determine, based on all the evidence, whether the employer's decision to terminate the plaintiff was motivated by intentional age discrimination." *LeBlanc*, 6 F.3d at 843. Even at the summary judgment phase, the plaintiff must present not just minimally sufficient of *pretext*, but evidence that "overall reasonably supports a finding of discriminatory animus." *Id.* quoting *Goldman v. First Nat'l. Bank of Boston*, 985 F.2d at 1117.

#### 2. The Prima Facie Case

■ When an employee is terminated as part of a reduction in force a *prima facie* case of age discrimination is established when the plaintiff demonstrates that he 1) was at least forty years of age, 2) met the employer's legitimate job performance expectations and 3) experienced an adverse employment action. Finally, he must show that the employer did not treat age neutrally, or younger persons were retained in the same position. *Hebert v. Mohawk Rubber Co.*, 872 F.2d 1104, 1111 (1st Cir.1989); *Goldman v. First Nat'l Bank of Boston*, 985 F.2d at 1117.

■ Westvaco argues that Martin is unable to satisfy the fourth prong of his *prima facie* case because 1) his job was eliminated, *i.e.* no one was retained in Martin's position, and 2) all the factors used to eliminate the MPC Coordinator position were age neutral. Though slender, Martin's statistical evidence is sufficient to create a presumption of discriminatory animus at the summary judgment stage.

The plaintiff has presented an expert's statistical breakdown, by age, showing how the March, 1991 layoff impacted all fifty employees who comprised the Engineering Department. The statistical data reveals that the jobs of a disproportionate number of employees age 50 and over were targeted for elimination in the March, 1991 RIF. Affidavit of George Cobb. In the first three rounds of RIF planning, employees age 50 and older were three times more likely to lose their jobs. *Id.*, ¶¶ 12, 13. For all five rounds taken together, those age 50 and over were 1⅔ more likely to lose their jobs. "The data show[s] a very pronounced pattern which conclusively rules out the possibility that the reduction in force in the Engineering Department was age-neutral in its effects." *Id.* at ¶ 12.

Bearing in mind the that plaintiff's burden of making out a *prima facie* case is not an onerous one, a reasonable jury could conclude that this statistical evidence satisfies the fourth element of the plaintiff's *prima facie* case and suffices to create a presumption of age discrimination.[4] *See Texas v. Dep't. of Community Affairs v. Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093–94.

### 3. *Westvaco's Non-discriminatory Justification*

■ The defendant has come forward with a legitimate nondiscriminatory reason for Martin's termination. Westvaco states that to ensure the future viability of the Envelope Division, the Engineering Department had to reduce fixed costs, necessitating, *inter alia*, the elimination of the Machine Parts Control unit, including the position of MPC Coordinator held by the plaintiff. Johnstone, the Envelope Division Manager, stated that the Engineering Department's role in actual machine manufacture was being radically curtailed, if not eliminated entirely.

At deposition, Georgiades admitted that many of Martin's former tasks were still performed by remaining Engineering employees after the March layoff. However, he contended that the volume of MPC work performed following the March, 1991 RIF was qualitatively below that performed prior to the reorganization. Doug Purcell, a remaining employee who performed many of Martin's former functions averred that after March 1, 1991, all the work of the former MPC unit—comprised of a supervisor, coordinator, two crib attendants and a clerk—was carried out by remaining employees who collectively devoted less than forty hours a week to MPC tasks.

Westvaco has articulated a legitimate and nondiscriminatory business rational for its action. The burden of proof now shifts back to Martin.

### 4. *Pretext and Discriminatory Animus*

■ Martin claims that the statistical analysis presented in support of his *prima facie* case also has significant probative value at this stage, citing *Freeman v. Package Machinery Co.*, 865 F.2d 1331, 1341–42 and n. 5 (1st Cir.1988). Martin claims that, as in *Freeman*, the statistics used here are highly probative and carry a significant portion of his burden of proving pretext and discriminatory animus.

The court cannot agree. Plaintiff's statistical showing would not, by itself, be sufficient to avoid summary judgment. However, *other* circumstantial evidence of discrimination exists and permits a factfinder to consider the expert's statistical analysis along with all the other evidence to decide the ultimate issue of intentional discrimination.

### a. *Statistics and Plaintiff's Theory of Pretext*

Courts have repeatedly stated that statistical evidence—standing on its own or in combination with direct and comparative evidence—is permissible on the issue of pretext in a disparate treatment case. *Freeman v. Package Machinery Co.*, 865 F.2d at 1342 (affirming the probative value of using statistics to show pretext); *see also, McDonnell Douglas v. Green*, 411 U.S. 792, 805, 93 S.Ct.

---

4. This court will deny defendant's Motion to Strike the Cobb affidavit. Cobb's statistics were compiled from discovery exhibits appended to affidavits submitted by the defendant. As such, they rest on an adequate evidentiary foundation. Whether these statistics are entitled to further consideration as proof of pretext and age animus is addressed below.

1817, 1825, 36 L.Ed.2d 668 (1973) ("statistics as to ... employment policy and practice may be helpful to a determination of whether [the employer's conduct] conformed to a general pattern of discrimination").

In *Freeman*, the raw data of statistical analysis included only the presidents and vice-presidents previously terminated by the employer—employees in the same job position as the plaintiff.[5] *Freeman v. Package Machinery Co.*, 865 F.2d at 1342. The court relied on the fact that the statistical sample used was the entire "relevant statistical universe" and for this reason concluded that the statistical evidence was "adequate, in conjunction with the remainder of the proof, to cast a pall over the authenticity of the asserted reason for the firing and to suggest that a pattern or practice of age discrimination was in ignoble operation." *Id.*

In this case, plaintiff's "statistical universe" comprises the entire Engineering Department, a potpourri of engineers, designers, machinists and clerks, along with the personnel in the MPC unit. The Engineering Department is too heterogeneous a sample to show a pattern of age discrimination in the specific decision to eliminate the MPC, a functional sub-group of the Engineering Department. When juxtaposed with the defendant's proffered non-discriminatory business justification for terminating Martin, it is apparent that the statistics that sufficed to carry plaintiff over the initial hurdle have less probative value at this stage of the case, since they do not rebut the defendant's specific reason for terminating Martin. Comparing lay-off decisions regarding employees in different positions presents glaring problems. Most obvious is the fact that, according to the defendant, virtually 100% of the MPC unit was terminated. This leaves little room for percentage analysis.

#### b. *Other Circumstantial Evidence*

■ Martin has pointed to evidence in the record that undermines the credibility of Westvaco's stated reason for terminating Martin, and, in combination with the statistical evidence, permits an inference that age animus infected the decision to end his employment. Deposition testimony, affidavits and exhibits show that as early as the summer of 1991 the Engineering Department continued to build and had further plans to construct envelope-making machinery. This directly undercuts the defendant's stated reason for terminating Martin: that the MPC unit was being eliminated because the Engineering Department was no longer building manufacturing machinery. Indeed, such plans *may* be found to raise a specter of mendacity with respect to the defendant's alleged non-discriminatory offering. *See Hicks*, —— U.S. at ——, 113 S.Ct. at 2751–53.

Moreover, exhibits in the record also permit a factfinder to conclude that Georgiades' decision to eliminate Martin *preceded* his decision to eliminate the MPC unit. As early as January 8, Georgiades' organizational chart did not list Martin but *still showed* a viable MPC unit. It showed other Engineering Department employees being shifted into the MPC unit after the decision was made to lay off Martin and his supervisor, Al Sattler. This claim is given additional credence by Georgiades' organizational chart, dated January 28, 1991, which was constructed following the fifth and final round of job cuts. It showed the department with only twenty-two employees, but still containing an MPC unit of three employees. This contrasts sharply with Georgiades' final organizational chart, dated March 4, 1991, which does not contain an MPC unit but is comprised of substantially the same personnel as the January 28 chart.

Based on these facts, plaintiff contends that the MPC unit was still essential to the

---

5. In *Freeman v. Package Machinery*, the plaintiff was sixty years old and a vice-president at Package Machinery ("PMC") when he was fired. *Freeman v. Package Machinery Co.*, 865 F.2d at 1342. His successor was forty-eight. PMC claims he was fired because his working relationship with his superior "collapsed". *Id.* at 1334. To show the pretextual nature of the firing, Free-

man introduced statistical evidence analyzing the ages of eighteen presidents and vice-presidents that left PMC during the fifteen years preceding Freeman's termination. The departed executives, were, on the average, in their fifties when terminated and their replacements were significantly younger. *Id.* at 1342.

department's functioning after the March layoff and, in fact, was not eliminated. Instead, its tasks were dispersed among certain remaining Engineering Department employees. As such, Martin claims the "final" organizational chart was a ruse, an effort to obfuscate the real state of affairs in the department and cover up Georgiades' decision to eliminate Martin and other employees in the protected age class.

Plaintiff contends that the January 28 chart shows Georgiades' true intentions. On that chart, he slated three employees, all significantly younger than Martin, to constitute the MPC unit: S. Cook, a 48 year old design engineer, Doug Purcell, a 29 year old Customer Service Engineer and former MPC clerk Amy Carta, age 25. As early as January 8, the decision had already been made to terminate Martin and his supervisor, Al Sattler, age 60. A reasonable inference from this chronology is that, as late as January 28, Georgiades still planned to maintain an MPC unit and was considering younger employees to fill positions previously held by Martin and Sattler. A comparison of the organizational charts supports an inference that a generalized age animus infected Georgiades' decision-making process.

The defendant holds out Leahy's January 24, 1991 evaluative guidelines to show that the reduction in force was fair and free of invidious age discrimination. Leahy's directives required that two employees being considered for one position were to be evaluated and comparatively ranked. The employee with the higher score was then given the job.

However, at least with regard to Martin, a number of facts indicate that these guidelines may not have been followed. Martin was never evaluated. Indeed, Georgiades and Leahy contend there was no reason to do so because Martin's position was being eliminated. They further state that there was no reason to rank Martin and compare him to Purcell because they occupied distinctly different jobs and were not being considered for the same position. But the January 28 organizational chart shows that two Engineering Department employees, Purcell and Cook were slated to "bump" into the MPC unit,

replacing Martin and others. It appears that Leahy's guidelines required Georgiades to evaluate Martin and then rank him along with Purcell and Cook. Moreover, the record indicates that Georgiades made the bulk of his staff cuts—including a decision to terminate Martin—before he ever received Leahy's evaluative guidelines.

A jury might therefore reject the defendant's argument that it took steps to insure that managers did not take age into account when cutting staff positions. When viewed in the context of other circumstantial evidence, a jury could reasonably conclude, not only that Georgiades did not follow proper guidelines, but that age animus infected his decision-making process.

To summarize, the record permits a factfinder reasonably to conclude that following the force reduction, Westvaco still planned to build envelope-making equipment in-house and surreptitiously maintained a revamped MPC unit, staffed by persons younger than Martin. A trier of fact could further conclude that the Leahy guidelines were never followed and, along with the final organizational chart, were intended to mask decisions that were infected with an age animus.

The plaintiff's argument is problematic and the defendant has presented strong evidence to support a contrary conclusion. Based on the record before this court a jury could conclude that "the employer made an unwise business decision, or an unnecessary personnel move" that did not stem from Martin's age. *Gray v. New England Telephone and Telegraph Co.*, 792 F.2d 251, 255 (1st Cir. 1986). However, "strong evidence is not necessarily uncontradicted evidence; and at the summary judgment stage a . . . judge cannot 'superimpose his own ideas of probability and likelihood (no matter how reasonable those ideas may be) upon the [facts of] record.'" *Medina–Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 9 (1st Cir.1990) quoting *Greenberg v. Puerto Rico Maritime Shipping Auth.*, 835 F.2d 932, 936 (1st Cir.1987).

B. *Age Discrimination: State Law Claim—Ch. 151B*

■ Age discrimination claims brought pursuant to the federal ADEA and Mass.

Gen.Laws ch. 151B are both analyzed under the *McDonnell–Douglas* test. *See White v. University of Mass. at Boston,* 410 Mass. 553, 557, 574 N.E.2d 356 (1991); *McKenzie v. Brigham & Women's Hosp.,* 405 Mass. 432, 434, 541 N.E.2d 325 (1989). The only difference is that under state law, the employer must show that its proffered legitimate non-discriminatory reason is "credible." *Brunner v. Stone & Webster Engineering Corp.,* 413 Mass. 698, 700, 603 N.E.2d 206 (1991). Federal law only requires that the employer *articulate* a legitimate non-discriminatory reason for its adverse employment decision. *St. Mary's Honor Ctr. v. Hicks,* —— U.S. ——, ——, 113 S.Ct. 2742, 2747–48, 125 L.Ed.2d 407 (1993).

■ Here, Westvaco presented more than sufficient evidence showing that its non-discriminatory reason was "credible", thus placing the ball back in the plaintiff's court. The preceding discussion explains how the plaintiff has been able to present sufficient evidence to prove that the defendant's credible non-discriminatory reason could be found to be a pretext for age discrimination. No further discussion is required for the court to deny the defendant's motion for summary judgment on the state law claim of age discrimination.

## C. *Handicap Discrimination Claim: ch. 151B*

In a recent handicap discrimination case, the Supreme Judicial Court explained that in all employment discrimination cases alleging disparate treatment they have adopted "the framework of shifting burdens of persuasion and production of evidence that was articulated in *McDonnell Douglas Corp. v. Green.*" *Cox v. New England Telephone & Telegraph Co.,* 414 Mass. 375, 385, 607 N.E.2d 1035 (1993).

■ The plaintiff claims that his heart condition constituted a handicap that was a motivating factor in Westvaco's decision to terminate him. Rather than reciting the familiar litany recounting the parties' respective burdens, the court will assume, *arguendo,* that the plaintiff has established a *prima facie* case of handicap discrimination. The defendant's legitimate non-discriminatory business justification presented in response to the claim of age discrimination serves them equally well in the handicap discrimination arena.

Beyond asserting that Martin had a heart condition, only statistical evidence of handicap discrimination was presented. Martin submits that the six employees in the Engineering Department with disabilities were all eliminated in the first two rounds of lay-offs. In addition, two others laid-off at this time had spouses with serious health problems. Standing alone, plaintiff's statistical showing is extremely weak and provides no help. As the First Circuit said in *LeBlanc,* "[s]tatistical evidence in a disparate treatment case, in and of itself, rarely suffices to rebut an employer's legitimate non-discriminatory rationale for its decision to dismiss an individual employee." *LeBlanc,* 6 F.3d at 847.

The plaintiff is unable to point to specific evidence that could lead to the conclusion that the defendant's articulated reason for discharging him was a pretext for handicap discrimination. Nothing in the record permits an inference that Martin's heart condition was considered in the decision to terminate plaintiff. Indeed, when several years earlier his heart condition required an absence from work, the company appears to have been supportive and accommodating. There is no evidence of pretext or intentional handicap discrimination. With regard to the handicap discrimination claim, the defendant's motion for summary judgment will therefore be allowed.

## D. *Equal Rights Act Claim*

■ Summary judgment must also be granted on plaintiff's Equal Rights Act (MERA) claim, Mass.Gen.Laws ch. 93, § 103. As a matter of law, MERA does not provide separate remedies for employment discrimination over and above those provided by Mass.Gen.Laws ch. 151B.

Federal and state courts have repeatedly explained that ch. 151B provides the exclusive remedy for employment related discrimination claims. *Conway v. Boston Edison Co.,* 745 F.Supp. 773 (D.Mass.1990); *Mouradian v. General Electric Co.,* 23 Mass.App.

**94**

538, 503 N.E.2d 1318, *rev. denied,* 399 Mass. 1105, 507 N.E.2d 1056 (1987). More recently, federal and state court judges have specifically held that there is no difference in remedies available to the employee under Mass.Gen.Laws 151B and Mass.Gen.Laws ch. 93, § 103 and, consequently, employment discrimination claims brought pursuant to the latter should be dismissed. *Napolitan v. New England Telephone Co.,* C.A. No. 91–12973–MA, 1993 WL 65093, 1993 U.S.Dist. LEXIS 7770 (D.Mass. Jan. 15, 1993); *Pappas v. Chestnut Knoll,* C.A. No. 91–0044, slip op. at 3–4 (Hampden County Superior Court, July 18, 1992).

### V.   CONCLUSION.

For the foregoing reasons, the defendants' Motion for Summary Judgment is DENIED as to Counts I and VI, the age discrimination claims, and ALLOWED as to Counts II, and III, the handicap discrimination and MERA claims. A separate order will issue.